## Commonwealth *v.* Chaitt, Appellant.

Argued January 11, 1955.    Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Lemuel B. Schofield,* with him *John B. Brumbelow,* and *W. Hensel Brown,* for appellant.

*William C. Storb,* District Attorney, for appellee.

*Julian E. Goldberg* and *William Allen Rahill* filed a brief for American Civil Liberties Union, amicus curiae.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, March 14, 1955:

This case is concerned solely with the question of the admissibility, in a criminal prosecution, of evidence obtained by the interception of telephonic communications,—a process colloquially known as "wire tapping."

Defendant, Isaac Chaitt, was indicted, tried and convicted on charges of bookmaking and being a common gambler; he was sentenced to imprisonment and to pay a fine on the charge of bookmaking and sentence was suspended on the common gambler charge. The principal evidence adduced by the Commonwealth in support of the bookmaking charge consisted of certain telephone conversations between defendant and one Manduchi which were intercepted by two police officers of the City of Lancaster who had placed a tap on the telephone wire leading into Manduchi's apartment. These officers testified, over objection, as to the contents of the conversations they thus overheard and which revealed that defendant received and accepted horse race bets from Manduchi. The latter's apartment was at 715 North Duke Street, Lancaster, and the telephone calls were from there to defendant's apartment at 122 North Queen Street, also in that city. The court refused defendant's motion for a new trial and the Superior Court affirmed the judgment; (176 Pa. Superior Ct. 318, 107 A. 2d 214). From that affirmance we allowed the present appeal. It is conceded by the Commonwealth that if the testimony of the officers was improperly admitted defendant would have been, and now is, entitled to a new trial.

*At the outset it must be understood that we are not here concerned with the much controverted question as to whether there is any imperative need for wire tapping for the detection and prosecution of crime, or, even if such a need exists, whether it is outweighed by the iniquity of wire tapping from a purely ethical and social standpoint and by its impairment of the right*

*of privacy and therefore whether it should be permitted or whether it should be banned by the laws of this Commonwealth. That question is one of policy to be determined by the legislature. All that we are called upon to decide is in regard to a rule of evidence, namely, whether testimony which in itself is relevant to the determination of a defendant's guilt or innocence should nevertheless be rejected if it was secured in an allegedly improper manner.*

We start with the fundamental principle of the common law that the admissibility of evidence is not affected by the illegality of the means by which it was obtained. That rule, which has persisted uninterruptedly in the several jurisdictions of the United Kingdom and the British Commonwealth of Nations and in an overwhelming number of the States which have had occasion to consider the question, has also been firmly entrenched in the decisions of the appellate courts of our own Commonwealth. [1]

The Supreme Court of the United States has, through a course of decisions, [2] established as the law for the federal courts that, in a federal prosecution, the Fourth Amendment bars the use of evidence se-

---

[1] *Commonwealth v. Dabbierio,* 290 Pa. 174, 178-180, 138 A. 679, 681; *Commonwealth v. Hunsinger,* 290 Pa. 185, 138 A. 683; *Commonwealth v. Agoston,* 364 Pa. 464, 484, 485, 72 A. 2d 575, 585, 586; *Commonwealth v. Holgate,* 63 Pa. Superior Ct. 246, 254, 255; *Commonwealth v. Vigliotti,* 75 Pa. Superior Ct. 366, 378; *Commonwealth v. Grasse,* 80 Pa. Superior Ct. 480; *Commonwealth v. Rubin,* 82 Pa. Superior Ct. 315, 327; *Commonwealth v. Schwartz,* 82 Pa. Superior Ct. 369, 377, 378; *Commonwealth v. Dugan,* 143 Pa. Superior Ct. 383, 18 A. 2d 84; *Commonwealth v. Montanero,* 173 Pa. Superior Ct. 133, 96 A. 2d 178.

[2] For example: *Boyd v. United States,* 116 U. S. 616; *Weeks v. United States,* 232 U. S. 383; *Silverthorne Lumber Co., Inc. v. United States,* 251 U. S. 385; *Gouled v. United States,* 255 U. S. 298; *Byars v. United States,* 273 U. S. 28; *Lustig v. United States,* 338 U. S. 74.

cured through an illegal search and seizure by federal agents. On the other hand, however, it has definitely held that this ruling does not apply to prosecutions in a State court for a State crime: *Wolf v. Colorado,* 338 U. S. 25, nor where the illegal search and seizure has been made by anyone other than a federal officer acting under a claim of federal authority: *Weeks v. United States,* 232 U. S. 383, 398; *Burdeau v. Mc-Dowell,* 256 U. S. 465; *Feldman v. United States,* 322 U. S. 487, 490, 492; *Irvine v. California,* 347 U. S. 128, 136; *Serio v. United States,* 203 F. 2d 576.

With this background in mind we proceed to a consideration of the present question in regard to wire tapping, and in that connection the first point to be noted is that wire tapping is not a violation of the Fourth Amendment of the Constitution of the United States since the searches and seizures to which that Amendment relates are only of *material* things,—one's person, house, papers or effects. Therefore the interception of telephonic communications is not illegal nor are the overheard conversations inadmissible in evidence unless prohibited by statute: *Olmstead v. United States,* 277 U. S. 438, 464-468. It is by Section 605 of the Federal Communications Act of June 19, 1934, c. 652, 48 Stat. 1103, 47 U.S.C.A. §605, that such a prohibition was effected. That Section provides in substance that no person receiving or transmitting, or assisting in receiving or transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the contents thereof to any person other than the addressee, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto, and no person having become acquainted with the contents of the same, knowing that such information was so obtained, shall divulge or publish the contents thereof or use the

same or any information therein contained for his own benefit or for the benefit of another not entitled thereto. These provisions, therefore, prohibit employes of communication agencies from divulging any interstate or foreign communications. But the portion of the Section from which the present problem arises is as follows: "and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person."

Two questions soon arose as to the scope of this provision. The first was whether the phrase "no person" embraced federal agents engaged in the detection of crime, and whether "divulging" included the giving of testimony in a federal court as to the contents of an intercepted communication. In *Nardone v. United States*, 302 U. S. 379, it was argued that such general words as "no person" should not be held to include the sovereign and apply to federal officers, but the court held to the contrary and also that the prohibition against divulging the contents of intercepted messages banned the giving of testimony in regard thereto in a federal court.

The second question was whether the prohibition against interception applied to intrastate as well as interstate and foreign communications. In *Weiss v. United States*, 308 U. S. 321, a policeman in New York City acting under instructions of a United States Post Office Inspector, tapped telephone wires over a period of months; the intercepted messages consisted of both intrastate and interstate communications. The court stated that, since Congress had power, when necessary for the protection of interstate commerce, to regulate intrastate transactions, there was no constitutional requirement that the scope of this statute be limited so

as to exclude intrastate communications, and accordingly it held that none of the intercepted messages were admissible in evidence in a criminal prosecution in the Federal court.

In the present case there were *no* interstate communications, all the telephoning between defendant and Manduchi taking place within the City of Lancaster. There may be some room to doubt, therefore, whether the power of Congress to regulate interstate commerce extends to such a situation, or, if so, whether the decision in the *Weiss* case was intended to be broad enough to include the interception of purely local messages. Be that as it may, however, the more important question is whether State agents engaged in the detection of a State crime and testifying in a State court are included within the intended scope of Section 605 of the Act. It is the contention of appellant that they are so included and that therefore they not only commit a crime when they *intercept* a communication but an additional crime when they *divulge* it by testimony in court; accordingly he argues that for the court to allow them to give such testimony is practically to sanction and condone the commission of a criminal offense in its very presence, and therefore, even though their testimony be relevant to the determination of the guilt or innocence of the person on trial, it should not be received under such circumstances. Appellant would thus distinguish the search and seizure cases previously referred to on the ground that there the witness merely testified to the information gained by a crime already committed but did not commit another crime in and through the very act of testifying.

In our opinion Section 605 of the Act was not intended to, and does not, relate to the divulging of the contents of intercepted communications by State agents

testifying in the criminal prosecution of a State crime in a State court. In *Schwartz v. Texas,* 344 U. S. 199, it was held that the Section applies only to the exclusion in federal court proceedings of evidence obtained and sought to be divulged in violation thereof, but does not exclude such evidence in State court proceedings. When it is borne in mind that an intention of Congress to supersede or suspend the exercise of the police powers of the States, even when it has the power to do so, is not to be implied unless its purpose to effect that result is clearly manifested, (*Reid v. Colorado,* 187 U. S. 137, 148; *Atchison, Topeka & Sante Fe Rwy. Co. v. Railroad Commission of California,* 283 U. S. 380, 392, 393), it would seem quite incredible that Congress intended by the phraseology it employed in Section 605 to interfere with those police powers and thereby prevent the States not only from seeking to detect the commission of crime but even possibly to prevent it. It would seem likewise incredible that Congress could have intended to make it a crime for a State agent to testify in a State court to intercepted telephonic communications and thus, in effect, while on the one hand admitting the existence of the power in the States to receive such evidence, on the other making it practically impossible for such testimony to be given. And since the *Schwartz* case holds that notwithstanding the prohibition of Section 605 State agents *may* divulge the contents of intercepted communications in testimony in a State court, the inescapable inference is that the provision in that Section that "no person shall divulge" such communications does not include State agents in the phrase "no person." [3] Such interpreta-

---

[3] The statement on page 201 that "the introduction of the intercepted communications would itself be a violation of the statute" is obviously dictum, not being borne out by the actual decision of the court and being inconsistent with the decision in that, if such

tion is in accord with the well established rule of statutory construction that the literal terms of a statute not only may, but must be limited in their application where a consideration of the whole legislation indicates that such was the intention of the framers: *United States v. Kirby,* 7 Wallace (74 U. S.) 482, 486, 487; *Church of the Holy Trinity v. United States,* 143 U. S. 457, 459; *Guessefeldt v. McGrath, Attorney General,* 342 U. S. 308. Thus in the last-named case, where an Act of Congress provided that "No property . . . of . . . any national of either such country [Germany or Japan] . . . shall be returned to former owners thereof . . . ," it was ruled, notwithstanding the inclusiveness of the term *"any* national," that it should be held applicable only to *some* German "nationals," namely, those who were enemies.

Several States have held, notwithstanding Section 605 of the Federal Communications Act, that evidence procured by wire tapping was admissible in their courts, and such evidence was in fact admitted in *Leon v. State of Maryland,* 180 Md. 279, 284, sub nom. *Hubin v. State,* 180 Md. 279, 23 A. 2d 706, 709; in *People v. Channell,* 107 Cal. App. 2d 198, 199, 236 P. 2d 654, 657, 658; in *Harlem Check Cashing Corporation v. Bell, Superintendent of Banks,* 296 N. Y. 15, 68 N.E. 2d 854; and in *People v. Stemmer,* 298 N. Y. 728, 83 N.E. 2d 141. In the *Harlem Check Cashing Corporation* case it was said: "While there are expressions in the opinion of the court [in the *Weiss* case] which seem to go so far as to interpret the Federal Statute as a substantive law forbidding all disclosure or divulgence, the decision was concerned only with the propriety of

testifying were to constitute the commission of a federal crime, the court would scarcely have decided or Congress have intended that the States were at perfect liberty to permit and even invite the breach of a federal penal statute.

the receipt of such intercepted messages in evidence on the trial of a criminal case in a Federal court. The State of New York having provided, by Constitution and statute, certain specific methods by which it may exercise its fundamental power of gathering evidence of criminality and of prosecuting crime, it surely is not to be assumed that Congress intended to circumscribe that power unless it unequivocally indicated such an intent. A Federal statute, it is recognized, must be presumed to be limited in effect to the Federal jurisdiction and not to supersede a State's exercise of its police power unless there be a clear manifestation to the contrary." [citing cases].

The admission by the trial court of the testimony here in question was not a violation of either the Federal [4] or the State constitution, nor of any legislative enactment of the Commonwealth, nor, in our opinion, of the Federal Communications Act of 1934, and no court, in the 20 years which have elapsed since the passage of that Act, has decided to the contrary.

The order of the Superior Court, affirming the judgment of the Court of Quarter Sessions of Lancaster County, is affirmed.

---

Dissenting Opinion by Mr. Justice Musmanno:

Insofar as certain phases of human liberty are concerned, the decision of this Court today takes Pennsylvania back to 1775. Instead of a Redcoat before every door, there will be a potential spy lurking in every home to record, repeat and circulate the most

---

[4] *Olmstead v. United States*, 277 U. S. 438; *Feldman v. United States*, 322 U. S. 487, 490; *Wolf v. Colorado*, 338 U. S. 25; *Irvine v. California*, 347 U. S. 128, 136; *Serio v. United States*, 203 F. 2d 576, 578, and cases there cited.

guarded of communications, the most intimate of conversations and the most inviolable of confidences. That the highest tribunal in this Commonwealth should countenance a situation so opposed to the creed of freedom is to me as incomprehensible as it is deplorable. The same Founding Fathers who wrote that "No soldier shall in time of peace be quartered in any house without the consent of the Owner," also wrote that "The right of the people to be secured in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated."

There was no telegraphy or telephony in 1789, or, who can doubt that those same guardians of liberty would have added to the Fourth Amendment that the right of privacy in communications by wire shall also not be violated? There is no difference in principle between a communication which is reduced to writing and one which is mechanically recorded by some other medium. If the Constitution protects the message which a citizen has committed to paper, why should it deny him protection for the same message which he commits to a wire? As no one has the right to bore through the walls of his neighbor's house to listen to his conversation, so also he has no right to draw the same information from a cable which originates in that neighbor's dwelling. Breaking into a citizen's house and taking away an article which may be used against him is but a slight invasion of privacy as compared to taking away all his private utterances, his intimate observations, his spoken aspirations, etc., etc. Had the telephone been invented prior to 1873, I do not doubt that the Constitutional Convention which met in Philadelphia that year would have so written Section 8 of Article I of the Pennsylvania Constitution as to guarantee citizens protection from unreasonable searches regardless as to how perpetrated—by door-

breaking, window-smashing, or wire-tapping. But what does not appear in Section 8 in words is certainly present in principle.

The Majority of the Court says that it is not concerned with the question of wire-tapping from "a purely ethical and social standpoint and by its impairment of the right of privacy." That may be true, but this Court still has to be concerned with the constitutional rights of the defendant. The Majority says that no constitutional right is involved on the supposition that the protections guaranteed by the Fourth Amendment are only of *"material* things." * What is a material thing? Is liberty non-material? Does liberty become material only when wrapped in chains? If liberty means anything it means the right to deal and converse with one's family, friends and the rest of the human race unimpeded and unhampered by officious eavesdroppers. This proposition is so self-evident that to expatiate on it is to envelop it in layers of argumentation that can only obscure its sacred and pristine truth.

In the case of *Boyd v. United States,* 116 U. S. 616, the Supreme Court of the United States, quoting with approval the judgment of Lord Camden in the famous case of *Entick v. Carrington,* 19 Howell's State Trials, 1029, said: "The principles laid down in this opinion affect the very essence of constitutional liberty and security . . . They apply to all invasions on the part of the government and its employes of the sanctity of a man's home and the *privacies of life.* It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, *personal liberty* and private property,

---

* Emphasis by Majority.

where that right has never been forfeited by his conviction of some public offence—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but *any forcible and compulsory extortion of a man's own testimony* or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendment run almost into each other." *

In support of its proposition that the Fourth Amendment applies only to material things such as "one's person, house, papers or effects," the Majority cites *Olmstead v. United States*, 277 U. S. 438 (decided in *1928*) but in the light of the Federal Communications Act of *1934*, which makes of a telephone conversation a property right which cannot be taken away even by the Federal Government, the *Olmstead* case is no longer controlling. The case of *Nardone v. United States*, 302 U. S. 379 emphasizes that fact. Indeed Section 605 of the Federal Communications Act bears the cloak of authority of the Fourth and Fifth Amendments. Supreme Court Justice ROBERTS, speaking for the Court in the *Nardone* case, said: "The same considerations may well have moved the Congress to adopt §605 as evoked the guaranty against practices and procedures violative of privacy, *embodied in the Fourth and Fifth Amendments of the Constitution.*"

What is the imperative need for the drastic police measure which today gains the imprimatur of the Supreme Court of Pennsylvania? What are the facts in the case which has moved the Majority of this Court to approve a practice which strikes at the very heart

---

* Italics throughout mine, unless otherwise indicated.

of the sanctity of free and untrammeled communication between and among citizens of Pennsylvania? On September 21, 1951, two police officers, Albert Farkas and Thomas Williams, descended into the basement of the apartment house at 715 North Duke Street, Lancaster, and attached a wire-tap to the telephone line serving Richard Manduchi who lived on the first floor. On that day and for the following three days these two policemen listened through their clamped-on device to conversations between Richard Manduchi and Isaac Chaitt, the defendant in this case. They heard these two men discuss race horses, baseball pitchers and football games. They heard the placing of bets of $1, $2 and $3 and $5 "round robin parlays" on horses with names such as Ham Bone, Little Colleen, Miss Ellaneous, Fighting Thru, Papa Charlie, Dandy Foot, William Tell, Knot Hole, Betsy Marie, Poocha and Under the Rug.

On September 26, 1951, Manduchi and Chaitt were arrested. Manduchi pleaded guilty to bookmaking. Chaitt pleaded not guilty to charges of bookmaking and common gambling. At the trial Farkas and Williams testified to the manner in which they applied their home-made gadget to the telephone wire. Those who believe that wire-tapping is a very complicated and difficult procedure will be astonished, not to say dismayed, to learn how simple and easy this ominous invasion of a citizen's privacy can be accomplished. Farkas testified: "Q. You say you made this tap, tell the court and jury how you do that. A. It is very simple, the headset that you have has two wires attached to it and possibly 50 feet of wire, 2-strand wire and the telephone wire is also a double wire. It doesn't matter which one of our two wires we tap into the terminal there, if we tap into a negative with one of our negative— Q. What do you mean by negative?

A. All electricity runs negative and positive. Q. What did you have to get, a negative or positive connection to connect? A. Both. Q. You have to attach both negative and positive, that is the reason you have two wires? A. That is correct. All wires have a little clamp, spring clamp of metal which you place like this (indicating). It opens up and when you let it go, it clamps down and all you do is clamp one wire to one wire and take the other wire and clamp it to the second telephone wire."

How long does it take to attach this device? Two hours? An hour? Twenty minutes? Not at all. It can be attached in ten seconds! Farkas testified: "Q. What terminal did you tap on to? A. There is a small box in the cellar where wires come in from the outside. Q. You attach one of the wires to that? A. You, you attach it to the terminal point leading to the front room telephone. Q. How long did it take you to do that? A. *Possibly ten seconds.*"

Thus, the liberty of privacy which has been achieved through centuries of struggle may, in the hands of wilful meddlers, be lost in ten seconds.

The defendant Chaitt objected to the introduction of the conversations allegedly overheard through the wire-tap but the Court overruled the objection. Chaitt was convicted on both counts. The Court sentenced him to pay a fine of $300 and undergo three months' imprisonment in the Lancaster County jail. The defendant appealed to the Superior Court which affirmed the conviction and the case has come to this Court on the granting of an allocatur.

The issue before us is a simple one. Is wire-tapping constitutionally permissible in Pennsylvania? It is the first time that this question has come before the Supreme Court of Pennsylvania so that this Court stands in the wholesome and enviable position of appraising

the problem according to the fundamental principles of elemental justice without the shadow of a single binding precedent to darken any phase of the question as it falls under the light of pure reason. We here stand at the crossroads of a decision vital to the welfare of every man, woman and child in Pennsylvania.

It is certainly unnecessary in the full mellowing hour of Pennsylvania's glorious history to point out that no State in the world has been more genuinely devoted to the sacred cause of liberty—political, religious and personal liberty.

Section 1 of Article I of our Constitution declares: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." One of the pursuits of happiness is privacy. The right of privacy is as much property of the individual as the land to which he holds title and the clothing he wears on his back. Justice BRANDEIS in his Dissenting Opinion in the case of *Olmstead v. United States*, 277 U. S. 438 said that the invasion of privacy by telephone is even greater than that involved in tampering with the United States mails: "Whenever a telephone line is tapped, the privacy of the persons at both ends of the line is invaded and all conversations between them upon any subject, and although proper, confidential and privileged, may be overheard. Moreover, the tapping of one man's telephone involves the tapping of the telephone of every other person whom he may call or who may call him. *As a means of espionage, writs of assistance and general warrants are but puny instruments of tyranny and oppression when compared with wire tapping.*"

The greatest joy that can be experienced by mortal man is to feel himself master of his fate,—this in small as well as in big things. Of all the precious privileges and prerogatives in the crown of happiness which every American citizen has the right to wear, none shines with greater luster and imparts more innate satisfaction and soulful contentment to the wearer than the golden, diamond-studded right to be let alone. Everything else in comparison is dross and sawdust.

Section 8 of Article I of the Pennsylvania Constitution and the Fourth Amendment to the Constitution of the United States are dedicated to this right to seclusion. But if police agents and private intermeddlers may without legal responsibility peer through keyholes, eavesdrop at the table, listen at the transom and over the telephone, and crawl under the bed, then all constitutional guarantees become meaningless aggregation of words, as disconnected as a broken necklace whose beads have scattered on the floor.

It is rudimentary political science in a republic, that so long as one is law-abiding, he is not to be disturbed, harassed or interfered with by the law. If it is said that Isaac Chaitt was not law-abiding, the answer is that the millions of law-respecting citizens should not be shorn of their constitutional guarantees merely because the police suspect that one certain person is not staying within the confines of the criminal code. The great Justice Holmes, in his Dissenting Opinion in the *Olmstead* case, supra, said: "We must consider the two objects of desire, both of which we cannot have, and make up our minds which to choose. It is desirable that criminals be detected, and to that end that all available evidence should be used. It is also desirable that the Government should not itself foster and pay for other crimes, which they are the means by which the evidence is to be obtained . . . We have to

choose, and for my part I think it is a less evil that some criminals should escape than that the Government should play an ignoble part."

Arrived at the crossroads to which the case at bar has taken this Court on a constitutional question, I prefer humbly to choose to stand with Justice HOLMES in the determination so resolutely expressed by him that the rights of liberty on which this nation is founded shall not be violated, even by an arm of the government itself. I would rather see a petty gambler go free than that the great people of this Commonwealth should be deprived of the personal liberties forged in the fires of Lexington and Gettysburg and formulated amid the storm of debate in our legislative halls. A police department worthy of the name can and will find a way of tracking down malefactors without shaming the Constitution, the Bill of Rights and all the other immortal guarantees which have made the name of Pennsylvania one to conjure with in the great temple of liberty.

In an intelligent and responsible society a rule of proportion, not to say of humanity, obtains in the consideration of every problem, including that of how to catch the law-evader. We are reminded by the lower Court that the police officers in the case at hand were detecting crime. Does that of itself excuse the commission of another crime? Is an officer to be allowed to run down a child in his automobile because he is pursuing a felon? Is he allowed to shoot into a crowd because somewhere in the throng a pickpocket is lurking? Is he allowed to poison a reservoir on the theory that a certain fugitive from justice will drink a cupful of the infected water?

Which is more important? That Isaac Chaitt be imprisoned for three months because he accepted some bets on horse races and a baseball game or that the

people should be secure in their homes against snoopers, eavesdroppers, meddlers and Peeping Toms? Which is more important? That a horse race gambler should be punished or that the integrity of one's home be protected? That a placer of bets be stopped or that the government not be degraded by trampling on rights of liberty ever sacred to this land?

I do not exclude that, where national security is involved, agencies of government, under proper judicial supervision, should be allowed to use every method known to the science of detection to ferret out Communist conspirators, spies and saboteurs and to bring them to book for their crimes which aim at the very destruction of this nation and all the liberties with which the name of America is synonymous. There should be no limitation of action where the Communist conspiracy is involved, because Communism seeks to thrust a knife against the very jugular vein of civilization.

However, that is not this case. This case has to do with a couple of petty gamblers; and, by the affirmance of the conviction of an offense which calls for a three-months jail sentence, police officers, detectives and private sleuths in every city, village, town and hamlet may repeat in the basement of every home in Pennsylvania what Farkas and Williams did in Lancaster. Under the guise of suspecting crime, public and private detectives may obtain information on business deals, commercial enterprises, industrial plans, stock transactions, governmental bids and projects. They may intercept telephone messages which can be used for extortion and as a means of giving business concerns secret surveillance over competitors. By dint of this decision of today unsupervised detective agencies may be emboldened to tap wires to obtain unauthorized information for the use of social scavengers, dis-

credited business sharpers and political buccaneers. They may pry into the most personal dealings and the most sacred relationships. They can tear aside the curtain which shields what the lawyer says to his client, the physician to his patient, the minister to the parishioner, the priest to the penitent, the husband to his wife and the fiance to his betrothed. Because of this decision every honest telephone user must conjure with the possibility that the phantom hand of the electronic eavesdropper may be clutching the very instrument into which he speaks.

The most malevolent scandalmonger without any official authority whatsoever may help himself at the banquet table of the most guarded secrets and may commit burglary of the most precious jewels of family intimacies and be immune from all punishment befitting so heinous and immoral a practise, with the exception of some trifling penalty for malicious mischief or trespass.

The protestations of Justice HOLMES and BRANDEIS in the *Olmstead* case against such a state of things so inimical to American traditions of fairness and honesty were joined in by their brethren Justice BUTLER and STONE. The conviction in that case (a violation of the National Prohibition Act) was gained by evidence obtained through wire-tapping. By a vote of 5 to 4, the Supreme Court of the United States sustained the conviction. Had the Supreme Court been composed of 7 Justices instead of 9, wire-tapping would even then, in 1928, have been branded illegal. However, ten years later, the reasoning of the HOLMES-BRANDEIS-BUTLER-STONE dissents became law when the Supreme Court said, in the case of *Nardone v. United States,* 302 U. S. 379, 383, that "it was less important [through the Communications Act of 1934] that some offenders should go unwhipped of justice than that officers

should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty."

Section 605 of the Federal Communications Act of 1934, 48 Stat. 1103, 47 U.S.C.A. 605, specifically declares, inter alia, that: ". . . No person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person . . ."

Section 501 of the same Act makes a violation of this provision punishable by fine and imprisonment. (47 U.S.C.A. 501).

In the *Nardone* case, a Federal agent testified in a United States District Court to obtaining evidence against the defendant through wire-tapping. The Supreme Court held that Section 605 of the Federal Communications Act absolutely forbade the divulging of intercepted telephone messages even though done by a Federal officer and that testifying in court was an act of divulgence prohibited by the statute.

The Majority says that since the telephoning in this case was entirely intrastate the prohibition in the Federal Communications Act does not apply, and cites the case of *Weiss v. United States*, 308 U. S. 321, as authority for that postulate. But the *Weiss* case declares just the contrary. On page 327 the Court said: "The section consists of four clauses separated by semi-colons. The pertinent one is the second: 'and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person;" And then added this authoritative utterance: *"Plainly the interdiction thus pronounced is not limited to interstate and foreign communications."*

Thus, whether the testimony introduced by **Farkas** and Williams in the case at bar applied to interstate or intrastate transactions is entirely irrelevant.

The Majority cites *Schwartz v. Texas,* 344 U. S. 199, in support of its position that the Federal Communication Act does not intend to exclude State agents from testifying in State prosecutions on evidence obtained by wire-tapping. The Supreme Court of the United States in the *Schwartz* case does say that it is for the State, in considering the question of whether or not to allow the introduction of wire-tapping evidence, to compose a "rule of evidence for use in its own courts." But the Supreme Court then goes on to emphasize that: *"Enforcement of the statutory prohibition in §605 can be achieved under the penal provisions of §501."* In other words, while the prohibited evidence may be introduced, the divulger is not immune from prosecution under the penal provisions of the Federal statute.

It is appalling to contemplate that by the Majority's decision, the Pennsylvania courts will immunize violators of a Federal Act and, by giving them *carte blanche* immunity, practically invite them to commit further invasions of the rights of privacy which an Act of Congress was intended to protect.

The Majority says that there is the "inescapable inference" that "the provision in that Section that 'no person shall divulge' such communications does not include State agents in the phrase 'no person.'" The Majority may find their inference inescapable, but the logic so employed cannot escape from the inference that it is quite illogical, when one considers that the Supreme Court of the United States has held that "no person" includes Federal employes. If the offense of wire-tapping is such an infringement of rights of United States citizens that even Federal officers are

not exempt from its penal provisions, certainly Congress would not intend to allow State agents to do what Federal agents are expressly forbidden to do. The interpretation of statutes is sometimes unavoidable where the language in question is vague, misty or obscure, but no interpretive reading glass is required to read that "no person" means no person. I believe that we can take judicial notice of the fact that the detectives involved in this case, regardless of their subterranean snooping, are still persons.

The Supreme Court of the United States categorically states in this same *Schwartz* case that "the introduction of the intercepted communications would itself be a violation of the statute." The Majority finds nothing controlling in this emphatic statement, by asserting that it is dictum. I cannot bring myself to believe that Mr. Justice MINTON who wrote the Opinion for the Court intended that this pregnant sentence was to die aborning.

What the Supreme Court of the United States says to us in the *Schwartz* case is that in preparing a rule of evidence on wire-tapping, we should keep in mind that wire-tapping is a Federal offense and that a wire-tapper is, therefore, a Federal offender. Thus reason, logic, fairness and even a certain degree of self-preservation dictate a severe condemnation by this Court of the United States crime of wire-tapping, no matter by whom committed. Say what one will, no one with a sensitive appreciation of the law can do other than experience shame in witnessing a State official brazenly testifying to violating a law of Congress, especially when this brazen defiance takes place within the very rail of the altar of justice. Justice BRANDEIS, in his brilliant Dissent in the *Olmstead* case, said: "Decency, security and liberty alike demand that *government officials shall be subjected to the same rules of conduct*

*that are commands to the citizen.* In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or ill, it teaches the whole people by its example. Crime is contagious. *If the Government becomes a law-breaker, it breeds contempt for law;* it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

Justice FRANKFURTER expressed the same abhorrence of governmental violation of the law in the case of *On Lee v. United States,* 343 U. S. 747, when he said: "To approve legally what we disapprove morally, on the ground of practical convenience, is to yield to a shortsighted view of practicability . . . Nor are the needs of an effective penal code seen in the truest perspective by talk about a criminal prosecution's not being a game in which the Government loses because its officers have not played according to rule. Of course criminal prosecution is more than a game. But in any event it should not be deemed to be a dirty game in which 'the dirty business' of criminals is outwitted by the 'dirty business' of law officers. The contrast between morality professed by society and immorality practiced on its behalf makes for contempt of law. Respect for law cannot be turned off and on as though it were a hot-water faucet."

But it is urged by the appellee in this case that wire-tapping is a potent weapon in fighting criminals. There was a time when the rack, the dungeon, the water-cure and the thumbscrew were used in fighting

criminals—and assumed criminals. There was a time when the homes of criminals—and assumed criminals —could be invaded without search warrants. Before Magna Charta and the Writ of Habeas Corpus, the State and those presumably acting in its behalf, could imprison criminals and supposed criminals without warrant of arrest or Court order or any judicial proceeding. There was a time when criminals and supposed criminals were harnessed in stocks, their ears lopped off and their bodies branded with hot irons. Not long ago, police used third degree methods which included rubber hose whippings, forced sleeplessness and other tortures to extract confessions from criminals and supposed criminals. It was argued in their time that to abandon these police methods against criminals would be to place society at the mercy of the lawless. But all these measures were eventually condemned and forbidden—and society did not perish. An enlightened people concluded that the damage done to humanity, society and respect for government by these brutal and barbarous methods far exceeded whatever problematical gain was achieved against evildoers. It was also found that the inhuman practices enumerated were more often used against the innocent than the guilty.

The value of wire-tapping in the prosecution of crime has considerably been over-rated. In the latter part of 1954, the Criminal Justice and Law Enforcement Committee of the Philadelphia Bar Association, after a considerable study of the subject, reported that "there is no indication that law enforcement is better in jurisdictions which use wire tap evidence (e.g., New York, New Jersey, Louisiana, Pennsylvania) than in jurisdictions which prohibit its use (e.g., Federal Government, Michigan, Missouri, West Virginia, Wisconsin)." The Committee declared that "it is impossi-

ble to accept assertions that wire tapping is 'essential' to law enforcement." *

In the State of New York, officious telephone listening is permitted only after application to and approval by the Court. Supreme Court Justice SAMUEL H. HOFSTADTER, after 22 years on the bench, recently turned down requests for wire-tapping permits with the statement that "It cannot even be said in partial extenuation of this *revolting practise* that it yields worthwhile results." The reports made by police on the use of the wire-tap caused Justice HOFSTADTER to say: "The reports received by me, instead of allaying my anxiety, merely deepened it. These showed few arrests and fewer convictions, and then rarely, if ever, for a heinous crime." **

Even in the case before us here, it is obvious that since the police officers had reason to believe that Chaitt was engaged in the crime of bookmaking, they could have found with the exercise of a little more effort, patience and ingenuity, the way for obtaining the necessary prosecution without themselves committing a crime.

The affirmance of the verdict in this case will serve, as already indicated, to authorize all those *supposedly* engaged in detecting crime to tap wires. We have seen how easily wire-taps may be constructed. There is no law against the manufacture of these secret-thieving machines and, with the decision of today, there now remains no law in Pennsylvania against their use. The person who is indifferent to the import and far-reaching effect of the decision of today might comfort himself with the thought that no one could possibly want to break in on *his* telephone wire. That assurance,

---

* Legal Intelligencer, December 1, 1954.
** Legal Intelligencer, January 14, 1955.

however, may be shaken when he hears of William J. Mellin who testified before a Senate Sub-Committee that he devoted forty years of his life almost exclusively to wire-tapping. He specified: "Incredible as it may seem, I have been able to calculate that in the course of my long career, I have tapped in excess of 60,000 pairs of wires." * Multiplying 60,000 by at least 10, we have to conclude that Mellin listened in on some 600,000 conversations!

Wire-tapping does not end with the mere listening operation. After the wire-leech has sucked in the blood of guarded secrets he is then in a position to blackmail his unwary conversant. He is in a position to traffick with corruption, threats and ill-gotten gains. That such a potential infamy can be tolerated in the name of the enforcement of law is the most extraordinary paradox in these paradoxical times. James Lawrency Fly, who served as chairman of the Federal Communications Commission from 1939 to 1944, has made the statement: "Wire-tapping and corruption walk hand in hand. Blackmail is one of the safest forms of extortion. The wire-tapper has a great resource for blackmail... No citizen, however innocent, is secure in his communications. Trunk lines and multiple family lines are tapped. Even public booths in great cities have been tapped. The phones of public officials and political headquarters have been tapped ... It is an essential characteristic of wire-tapping that in each case it is dragnet in character. It invades the privacy, not of one person, but of every innocent person who may use the line—even innocent persons who may be calling innocent persons on the tapped lines ... With this risk inherent, the whole theory of freedom of com-

---

* 83rd Cong., 2nd Sess., Senate Judiciary Subcommittee Hearings on Wire Tapping.

munications and the right of privacy and the Constitutional guarantee against unlawful search are in jeopardy." **

Now that the decision of today gives *open sesame* to all wire-tappers, what is to be the attitude of all telephone users in Pennsylvania? Will they approach a telephone with trepidation, fearful of the unknown gluttonous ear at the wire-tap ready to devour all that is to be said? And when the omnivorous wire-tapper has gorged on family secrets, business confidences and government material, what will he do next?

Ten years ago no one would have believed television possible. Yet that amazing magic box is with us today. The next invention in this field will possibly be a camera with lenses which will penetrate walls even as an X-Ray machine cuts through the flesh of anatomy and exposes all the secrets of the skeleton beneath. With this new camera one will be able, by standing on the street or even blocks away, to see what is happening inside a home, an office, or a bank. Police and detectives will naturally want to use that camera to look in on bookmaking rendezvous. Private detectives may also want to look into the parlors of homes and dwellings. Will a court of the future hold that such a camera may be used because it will uncover crime? Will it be argued in behalf of that machine that though its use may destroy all privacy and wreck every standard of decency and delicacy, it yet shall be utilized without limit so long as through its application a bookmaker may be jailed for having bet on Little Colleen, Miss Ellaneous, Ham Bone and Papa Charlie?

Such a glance into the mysterious yet-to-be is not as imaginative as it might seem. Justice BRANDEIS in his *Olmstead* dissent conjures a situation even more

---

** New Republic, February 6, 1950.

startling than the one at which I have intimated: "The progress of science in furnishing the Government with means of espionage is not likely to stop with wire-tapping. Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled *to expose to a jury the most intimate occurrences of the home. Advances in the psychic and related sciences may bring means of exploring unexpressed beliefs, thoughts and emotions.* 'That places the liberty of every man in the hands of every petty officer' was said by James Otis of much lesser intrusions than these. To Lord Camden, a far slighter intrusion seemed 'subversive of all the comforts of society.' Can it be that the Constitution affords no protection against such invasions of individual security?"

If wire-tapping, which admittedly is an invasion of privacy, is now authorized on the basis that it helps to detect crime, why shouldn't the law permit the placing of a recording device in physicians' offices? Criminals frequently are injured in making their escape and, while being treated, they give clues which could identify them as law-violators. The law could also authorize the lodgment of a recording device in the confessional where sins and law-violations are recounted. There should also be a tape recorder in every lawyer's office which the police could examine every day. The dragnet for criminals could become more effective by allowing police to enter any home on suspicion and search through every room for possible law-violators. The discovery could be extended by having censors open and read every piece of mail. The third degree could be restored. With this over-all coverage, there can be no doubt that a few more criminals would be caught and properly brought to justice. The job of the police in unearthing crime would be made easier, but

the shadows of tyranny would again creep toward Independence Hall and throw a twilight gloom on the Statue of Liberty in New York Bay.