Commonwealth, Appellant, *v.* Helms.

Commonwealth, Appellant, *v.* Spacil.

538

Argued December 4, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, and SPAETH, JJ. (VAN DER VOORT, J., absent).

*Timothy H. Knauer,* Assistant District Attorney, with him *Robert S. Gawthrop, III,* Assistant District Attorney, and *William H. Lamb,* District Attorney, for Commonwealth, appellant.

*Michael S. Barranco,* Assistant Public Defender, with him *John R. Merrick,* Public Defender, for appellees.

*William M. Hebrank*, with him *Raymond F. Scully*, for amicus curiae, The Bell Telephone Company of Pennsylvania.

OPINION BY JACOBS, J., June 24, 1975:

The appellees, Robert Helms and Kenneth Spacil, were charged with conspiracy to fraudulently obtain telecommunications service and conspiracy to possess and possession of instruments or devices used to achieve theft of communications service.[1] Both appellees moved to suppress evidence obtained by security personnel of the Bell Telephone Company of Pennsylvania contending that such evidence was obtained in violation of the Pennsylvania anti-wiretapping statute.[2] The lower court granted the suppression motions and the Commonwealth appealed.[3]

The facts reveal that an employee of Bell Telephone Company, while running a routine office check on telephone trunk lines, discovered the presence of unusual multifrequency sounds on one of the lines. On each of the next several days he also heard these unusual tones. The employee was aware that these sounds were not consistent with sounds generated by any equipment which the Bell System was using in the area, and were not consistent with any malfunction which he had been trained to anticipate in the equipment. He therefore suspected

---

1. Act of June 24, 1939, P.L. 872, §§302, 871.1, 898, 898.1, 18 P.S. §§4302, 4871.1, 4898, 4898.1, *repealed*, Act of Dec. 6, 1972, P.L. 1482, No. 334, §5.

2. Act of July 16, 1957, P.L. 956, §1, 18 P.S. §3742, *repealed*, Act of Dec. 6, 1972, P.L. 1482, No. 334, §5, *eff.* June 6, 1973. The present Pennsylvania anti-wiretapping statute is found at 18 Pa. C.S. §§5701-04 (1973), *as amended*, 18 Pa.C.S. §5702 (Supp. 1974-75), *as amended* by the Act of Dec. 27, 1974, P.L. 1007, No. 327, *eff.* Feb. 25, 1975, 18 Pa.C.S. §§5701-05 (Supp. 1975-76).

3. This appeal was proper under the rule of *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304, *cert. denied*, 375 U.S. 910 (1963).

that a trespasser was illegally using the equipment, and notified Bell security personnel.

The Bell security officer assigned to the case, acting with the assistance of the employee who had discovered the sounds, observed the multifrequency tones and the accompanying voice transmission. He identified the tones as emanating from a "blue box" device, an illegal electronic device which permits the user to electronically bypass telephone company billing equipment and to seize access to worldwide telecommunications equipment without charge. The security officer immediately ordered a trace of the line being used, which revealed that the call was placed from the address of one of the appellees, Kenneth Spacil.

Bell Telephone's security division then began an intensive monitoring campaign through which it positively identified 47 probable possessors and users of the blue box device. The security officer testified that the purpose of the investigation was to identify the parties who were in possession of and using the devices and to identify the methods employed. Commencing on the first evening of the investigation, August 23, 1971, the company made tape recordings of the conversations which were originated by means of the blue box. The security officer, Beam, admitted that the communications equipment was in perfect working condition and that he employed the taping procedure solely to determine who was defrauding the company and how. Beam testified that he continued to monitor and tape, over a one-month period between August 23 and September 23, 1971, conversations originating from the Spacil residence and three other residences as they were identified. He stated that some of the conversations monitored lasted as long as an hour and a half and reiterated, "[a]gain, these tapes were in the attempt for intelligence . . . " Beam testified that the telephone tap on the Spacil telephone was in operation 24 hours a day until it was removed in late September.

He stated that although the tap was not monitored for all of that time it would have been possible for anyone entering the room in which the monitor was located to listen to the phone. Although Beam testified that he was certain that no calls other than trespass calls were monitored, he acknowledged on cross-examination: "Q: You had to identify it as a trespass call by listening to the substance of it? A: That's right. And when we were in, I mean, this is what basically what [sic] I would do."

Beam also admitted that incoming calls not made by a blue box were monitored in some instances. Beam stated that although his purpose in the selective taping was to gain intelligence as to the methods employed and by whom, the tapes often included "general conversation" between the two parties, some of whom were not under investigation.

On September 24, 1971, Bell security personnel notified the District Attorney's office of the results of its investigation and the appellees were subsequently arrested and charged with the offenses indicated.

The appellees asserted in their suppression motions below that these acts by the telephone company employees were in violation of the Pennsylvania anti-wiretap statute[4] and that, therefore, all such evidence and the fruits[5] thereof were inadmissible in the prosecution against them. The Pennsylvania statute upon which they rely states in pertinent part:

"No person shall intercept a communication by telephone or telegraph without permission of the parties to such communication. . . . No person shall divulge or use the contents or purport of a communication intercepted in violation of this act. . . . The

---

4. *See* n. 2, supra.

5. *Wong Sun v. United States,* 371 U.S. 471 (1963); *United States v. King,* 478 F.2d 494 (9th Cir. 1973), *cert. denied,* 414 U.S. 846 (1974).

term 'divulge' includes divulgence . . . in a judicial, administrative, legislative or other proceeding. *Except as proof in a suit or prosecution for a violation of this act, no evidence obtained as a result of an unlawful interception shall be admissible in any such proceeding.*" (Emphasis added).[6]

The Commonwealth, however, and the Bell Telephone Company of Pennsylvania in an amicus brief, assert that the acts of the telephone company personnel were specifically excluded from the prohibitions of the Act by virtue of its last sentence, which states:

"Nothing in this act shall be interpreted to apply to acts done by personnel of any telephone or telegraph carrier in the performance of their duties in connection with the construction, maintenance or operation of a telephone or telegraph system."[7]

The resolution of this case thus turns upon the meaning and breadth of the statutory exclusion which pertains to telephone company personnel, most particularly it turns upon the meaning of the phrase "in connection with the construction, maintenance or operation." The Commonwealth argues that the phrase was intended to and should be construed to encompass the investigative procedures employed by the phone company in the instant case. It asserts that these procedures were necessary to maintain the integrity of the system by preventing fraud and to protect the continued operation of the system by assuring that all proper charges would be billed.

The issues before us thus simply defined are whether the Legislature in enacting the statutory exclusion intended to permit the communications carrier to engage in monitoring and recording for the *purposes* for which it

---

6. Act of July 16, 1957, P.L. 956, §1, 18 P.S. §3742, *repealed*, Act of Dec. 6, 1972, P.L. 1482, No. 334, §5.

7. *Id.*

was used in this case;[8] and if so, whether the *methods* employed broke the connection between the acts done and the "construction, maintenance or operation" of the system.

No Pennsylvania court has yet been presented with the interpretation of this statutory exclusion from the proscriptions of the statute, and we have found no cases from other jurisdictions in which courts have interpreted a similar exclusion.[9] It is true, as noted by the dissent, that the Pennsylvania statute imposes criminal penalties for its violation and must, therefore, be strictly construed.[10] Accepting such a construction, we are still unable to find that the exclusionary phrase "in connection with the construction, maintenance or operation" is "clear and free from all ambiguity."[11] When the words of a statute are not explicit the Statutory Construction Act permits us to consider in ascertaining the intent of

---

8. That is, whether monitoring done for the purpose of detecting and identifying the source and method of electronic theft can be said to be done "in connection with the construction, maintenance or operation" of the telephone system.

9. At least five states have statutory exclusions similar to that found in the Pennsylvania statute. *Cal. Penal Code* §631(b) (West 1969) ("construction, maintenance, conduct or operation"); *Nev. Rev. Stat.* §200.620(2) (1971) (semble); *Ore. Rev. Stat.* §165.540(2)(b) (Supp. 1974) ("construction, maintenance, or conducting"); *Wash. Rev. Code Ann.* §9.73.070 (Supp. 1974) ("construction, maintenance, repair and operations"); *Wis. Stat. Ann.* §885.365(2)(b) (Supp. 1974) ("construction, maintenance, conduct or operation"). Five other jurisdictions have statutes substantially paralleling the federal statute. *D.C. Code Ann.* §23-541 *et seq.* (Supp. 1974); *Fla. Stat. Ann.* §69-17 *et seq.* (1965); *Mass. Gen. Laws Ann.* ch. 272, §99 *et seq.* (Supp. 1974); *Minn. Stat. Ann.* §626A.01 *et seq.* (Supp. 1974); *N.H. Rev. Stat. Ann* §570-A:1 *et seq.* (Supp. 1974).

10. Act of November 25, 1970, P.L. 707, *as amended,* 1 Pa.C.S. §1928(b)(1) (Supp. 1974). [Hereinafter cited as Statutory Construction Act].

11. Statutory Construction Act at §1921(b).

the Legislature, among other matters, the occasion and necessity for the statute, the mischief to be remedied, and the object to be obtained.[12]

The problem of electronic surveillance poses many troublesome questions both for legislatures and courts. Our Legislature, as were others, was aware of the dangers inherent in the use of electronic surveillance and of the necessity of acting to prevent its proliferation. "The tremendous scientific and technological developments that have taken place in the last century have made possible the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized . . . "[13] "In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively . . . External restraints, of which electronic surveillance is but one possibility, are thus repugnant to citizens of such a society."[14] In considering the occasion and necessity for an anti-wiretapping statute and the mischief to be remedied thereby, the Legislature "was well aware of the grave threat to the privacy of every American that is posed by modern techniques of electronic surveillance." *United States v. King*, 478 F.2d 494, 503 (9th Cir. 1973), *cert. denied*, 414 U.S. 846 (1974). In interpreting the statute our Supreme Court noted that the Legislature "determined as a matter of state public policy that the right of any caller to the privacy of his conversation is of greater societal value than the interest served by permitting eavesdropping or wiretapping." *Commonwealth v. Papszycki*, 442 Pa. 234, 239, 275 A.2d 28, 30 (1971).

12. Statutory Construction Act at §1921(c) (1), (3), and (4).

13. S. Rep. No. 1097, 90th Cong., 2d Sess. (1968), U.S. Code, Cong. & Admin. News 2112.

14. The President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Organized Crime*, 18 (1967).

It is clear, however, that the Legislature did foresee the possibility that some conversation interception would be necessary by telephone company personnel "in the performance of their duties in connection with the construction, maintenance or operation"[15] of the system. We are inclined to accept the premise that the Legislature did not intend to leave the communications carrier without defense to the hazards of electronic theft. The operation of the telephone system must include the ability to insure that charges for telephone service are properly billed, and it cannot be doubted that widespread use of electronic devices would defraud the carrier of lawful revenues and would seriously undermine the ability of the company to render quality service to its customers. We therefore conclude that a communications carrier, consistent with the exclusion in the Pennsylvania statute, may monitor illegal phone calls in order to verify the presence and detect the source of electronic theft.

A conclusion that the telecommunications carrier may make a defensive effort to protect the integrity of its services, however, does not mean that the *methods* employed by the phone company in this case fall within the strictures of that exception. Activities lawfully begun in connection with the operation of the system may be escalated and extended into a sphere of activity which is no longer connected with the "operation" of the telephone system. The "object to be obtained"[16] by the anti-wiretap statute, the rigid protection of the right to privacy, must not be obscured in our interpretation of this statute. The Legislature clearly limited the immunity granted to communications carriers to those activities done "in connection with" the construction, maintenance or operation of the system. To read this limitation out of the statute would be to ignore the express dictates of the

15.  *See* n. 7 and accompanying text, supra.

16.  *See* n. 12 and accompanying text, supra.

statute and to act contrary to its overall objectives.[17]

A review of the facts of several recent cases demonstrates that it is possible for the telephone carrier to protect its system with a minimum of intrusion into the integrity of conversations. For instance, in *People v. Garber,* 275 Cal. App. 2d 119, 80 Cal. Rptr. 214 (1969), *cert. denied,* 402 U.S. 981 (1971), the telephone company established by use of a computer printout that over 2000 illegal calls were made from a given phone during a seven month period. The company then installed a monitoring system which was in operation for some 27 days. The tape recorder was activated only by the multifrequency tones of the blue box device, thus assuring that only illegal calls were recorded. During the continuance of the monitoring system there were only 28 hours of actual monitoring and only 65 minutes of blue box calls were actually overheard and recorded. By contrast, in the case at bar no computer evidence was introduced, the tape recorder was not selectively electronically activated, and the tap was left open 24 hours a day.

In *United States v. Shah,* 371 F. Supp. 1170 (W.D.Pa. 1974), the court after examining the facts held that the phone company acted reasonably in monitoring blue box calls. The phone company had made an analysis of computer print-outs and installed a recording device which was only activated by illegal tones. The recorder once activated only recorded the first 60 seconds of any conversation and then automatically shut off. The phone company explained that the sole purpose in the monitoring was to establish the identity of the person using the phone and thus the 60 seconds were thought to be sufficient to accomplish this objective. In that case no incoming calls were monitored and the total duration of the monitoring campaign was seven days. In *United*

---

17. We must construe the statute, if possible, to give effect to all of its provisions. Statutory Construction Act, §1921(a).

*States v. DeLeeuw,* 368 F. Supp. 426 (E. D. Wis. 1974), a multifrequency tone-activated recording system, which again recorded only the initial minute of any illegal call, was terminated after three days when the phone company established the identity of the caller.

In the case before us several salient facts are readily apparent. The recording system was not tone-activated; therefore, as Beam testified, the only means of identifying the call as illegal was by listening to its substance. Thus, legitimate calls were monitored and recorded. To argue that the monitoring and recording of legitimate phone conversations can be done in connection with the construction, maintenance or operation of the telephone system stretches the fabric of this Court's imagination. Secondly, no attempt was made to minimize the intrusion. This is, of course, completely contrary to the clear intent and mandate of the Pennsylvania anti-wiretapping statute. In this case some of the conversations monitored and taped were an hour and a half in duration and the tap was operating 24 hours a day. This activity extends far beyond any exclusion the phone company may need in order to continue effective and efficient service. The monitoring in this case continued long after the location, identity and method of the trespasser were clearly established. In our view such extensive monitoring and recording were unreasonable, unnecessary and unjustifiable. "To sanction such practices on the part of the telephone company would tend to emasculate the protection of privacy [the anti-wiretap statute] intended to protect." *Bubis v. United States,* 384 F.2d 643, 648 (9th Cir. 1967).

The Pennsylvania anti-wiretap statute applicable to this case unequivocally forbids the admission of evidence obtained as a result of an unlawful interception.[18] Because the monitoring done by the telephone company in this case far exceeded the bounds of the exclusion pro-

---

18. *See* n. 6 and accompanying text, supra.

vided by the Legislature it was done in violation of the act and the evidence was properly suppressed by the lower court. We recognize that our decision today permits the appellees to dodge the sword of justice, but we deem it more important that the telephone company should not resort to unreasonable and unnecessary practices. The Statutory Construction Act permits us to consider in ascertaining the intent of the Legislature, the consequences of a particular interpretation.[19] If we were to interpret as lawful the activities of the phone company in this case, we would be permitting the company to listen to and record any and all private conversations between citizens on the assertion that a search for possible electronic theft is "connected" to the operation of the system. We must presume that the Legislature did not intend such an unreasonable result.[20]

We cannot condone and we will not accept the acts of the telephone company in this case. It is our charge to jealously protect the individual right to privacy which is a hallmark of a free society. *Commonwealth v. Murray*, 423 Pa. 37, 223 A.2d 102 (1966). No system of justice in such a society can accept or tolerate unreasonable and unbounded intrusions, whether by government officials or by private individuals, upon that basic and fundamental right.

Orders affirmed.

---

DISSENTING OPINION BY CERCONE, J.:

I agree completely with the majority's thesis that rigid safeguards must be applied to wiretapping if an individual's right to privacy in telephonic communications is to be meaningful. However, I do not agree that, constitutional considerations aside, this court may "legislate" those safeguards; and, I find nothing in the act

---

19.  Statutory Construction Act, supra n. 10 at §1921(c)(6).

20.  Statutory Construction Act, §1922(1).

relied upon which prohibits the interception of communications by the telephone company in the instant case. In particular I disagree with the conclusion drawn by the majority that such a strict reading of the Pennsylvania statute leads us to conclude that the activities of the phone company in this case were unreasonably extensive and therefore beyond the contemplation of the statutory exclusion.

At the outset, it should be noted that the portion of the statute which excludes certain of the activities of the telephone company from the penal and evidentiary sanctions, in no way derogates an individual's right to privacy except in the sense that it fails to broaden that right. The statute does not affirmatively grant the right, privilege or license to the telephone company to wiretap in connection with any of its activities. The act only expressly disclaims any intention to prohibit such wiretapping by providing for the suppression of evidence produced by telephone company wiretaps or the imposition of criminal penalties on the company and its employees. Thus, if it were true in the instant case that the telephone company unreasonably exceeded any privilege it might have arising from its contractual relationship with appellees, appellees may have a remedy in tort for invasion of privacy. See Restatement of Torts, §867 & Comment d.[1] Since the act does not grant the telephone company the right to wiretap in connection with the construction, maintenance or operation of the telephone system the cases cited by the majority are not on point. Thus, the

---

1. There, of course, is no reason herein to discuss whether the appellees, by using the "blue boxes," waived their right to privacy with respect to the telephone company or, because of their inequitable conduct, are estopped from proving a tortious invasion of privacy. See Restatement of Torts, §867 & Comment d. In any event, innocent customers of the telephone company, who are unreasonably monitored, would have a remedy upon learning of such monitoring by the telephone company.

case of *In re Grand Jury Investigation*,[2] cited by the majority as an example of the proposition that statutes in derogation of the right of privacy must be strictly construed, is not helpful. Therein the court considered a state statute which *authorized* wiretapping in connection with particular crimes, and concluded that, since the act *created* an exception to the constitutional right to privacy, it must be strictly construed. No such "creation" exists in the instant case.

On the other hand legislatively mandated principles of statutory construction persuade me to reach a different result. First, the statutory prohibition against wiretapping which the court herein applies to the telephone company and its agents is, inter alia, a criminal statute, providing penalties for its violation of fines up to $5,000 and imprisonment for not more than one year. Presumably, therefore, Bell Telephone's security officer, who installed and operated the monitoring equipment, could receive such a penalty.[3] However, the legislature requires that we, in interpreting its laws, strictly construe statutes which carry criminal penalties in case of their violation.[4] Since the anti-wiretapping act purports to prohibit any person from wiretapping unless he is expressly excluded from its sanctions,[5] in narrowly interpreting the exclu-

---

2. 287 So.2d 43 (Fla. 1973).

3. Recognizing the possibility of this obviously unintended result, the lower court, in dictum, felt compelled to interpret the opening phrase of the telephone company's exclusion (i.e., "Nothing in this act . . .") to mean "no penal provision of this act . . ." As a result of that tortured construction of the act, the court could reach its desired goal; to wit, suppress the evidence and save the security officer from criminal sanctions.

4. Act of November 25, 1970, P.L. 707, No. 230, added 1972, December 6, P.L. 1339, No. 290, §3, 1 Pa. S. §1928(b)(1) (Supp. 1974). [Hereinafter cited as Statutory Construction Act.]

5. The act begins: *"No person* shall intercept a communication by telephone . . ."

sion, the majority necessarily broadly construes its penal provisions—a direct contravention of the Statutory Construction Act, justified only by proffering the false premise that the exclusion is in derogation of the right to privacy.

Second, the language of exclusion in the act is clear and unambiguous, at least as applied to the facts in the instant case:

> "Nothing in this act shall be interpreted to apply to acts done by personnel of any telephone or telegraph carrier in the performance of their duties in connection with the construction, maintenance or operation of a telephone or telegraph system."[6]

Once again, the majority's interpretation of the statute seems to run afoul of a provision of the Statutory Construction Act. "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuit of its spirit."[7] The anti-wiretap act is unambiguous. The statute does not talk in terms of *"necessary* acts done by personnel" or "the *reasonable* performance of their duties." The court today adds those limitations in pursuit of the "contemplation of the statutory exclusion," and despite the oft-repeated injunction that "it is not for us to legislate or by interpretation to add to legislation, matters which the legislature saw fit not to include." *Hochgertel v. Canada Dry Corp.*, 409 Pa. 610, 614 (1963). See also *Commonwealth v. Rieck Inv. Corp.*, 419 Pa. 52 (1965); *Daugherty*

---

6. Of course, in some situations the language, "in connection with the construction, maintenance or operation," may cause problems of interpretation. However, as the majority opinion points out, the courts have held that monitoring to detect the use of devices such as those involved in the instant appeals is an act done in connection with the operation of the telephone system.

7. Act of May 28, 1937, P.L. 1019, art. IV, §15, 46 P.S. §551 (1969).

*v. Continental Can Co., Inc.,* 226 Pa. Superior Ct. 342 (1973).

In conclusion, I find no authority in the anti-wiretap statute to justify the result reached by the court today. I would leave the appellees to pursue those remedies in tort which pre-existed the adoption of the act, rather than distort the provisions of the act in order to reach what, admittedly, under some circumstances may be a superior result.

DISSENTING OPINION BY PRICE, J:

I must dissent from the majority opinion. I do not perceive the limitations the majority feels are present in the exception to the Pennsylvania anti-wiretapping statute.[1] The wording is clear and unambiguous and contains *absolutely no mention* of the limitations placed upon it in the majority's opinion. The exception states:

"Nothing in this act shall be interpreted to apply to acts done by personnel of any telephone or telegraph carrier in the performance of their duties in connection with the construction, maintenance or operation of a telephone or telegraph system."[2]

Even if I were to ignore the clear language of the statute and assume *arguendo,* that the majority's requirements are correct, I would still be forced to dissent because I see no unreasonable conduct on the part of Bell Telephone Company's employees. My interpretation of the facts differs markedly from those recited by the majority, and I feel an extensive restatement is, therefore, mandated.

During routine tests, intended to check the working order of the telephone trunk lines, a Bell Telephone Company employee working in West Chester, discovered

1. Act of July 16, 1957, P.L. 956, No. 411, §1 (18 P.S. §3742), *repealed,* Act of Dec. 6, 1972, P.L. 1482, No. 334, §5.

2. *See* n. 1, *supra.*

unusual multifrequency sounds emanating from these lines. After these strange sounds were repeated for several days, the employee notified his superior, who in turn contacted the company security officer.

The security officer, Mr. Beam, joined the personnel at West Chester and after hearing the unusual sounds determined, in his expert opinion, that an electronic device called a "blue box" was being used to illegally gain access to long distance telephone lines. By use of the "blue box", the normal billing procedures used by the telephone company are circumvented. A trace of the call indicated that it came from the home of Kenneth Spacil.

Bell Telephone Company then launched an investigation to determine the extent of this particular "blue box" operation. In all, some 47 users of the "blue box" were identified. As a major part of their investigation, Bell Telephone employees placed taps on the appellees' telephones. The tap on the Spacil telephone was in operation 24 hours a day during the month of the investigation. However, Mr. Beam testified that although the tap was on 24 hours a day, actual monitoring was not conducted at all times. In addition to the monitoring, the telephone company also recorded some of the telephone conversations. Mr. Beam testified that the sole purpose of the recording was to aid in identification of the users of the illegal device.

Although both legal and illegal calls could have been monitored and taped, Mr. Beam testified several times that he was only concerned with illegal calls. The majority seems to indicate that the telephone company engaged in a bugging operation utilizing, at best, a random selection of which calls would be monitored. However, there is considerable testimony concerning the ability to distinguish illegal calls from legal ones without actually listening to the content of the conversations. For example, the following excerpt, wherein one of the defense attorneys is questioning Mr. Beam, demonstrates this fact:

"Q. How could you possibly select on only the persons who were trespassing on the lines as opposed to those who were legitimate users?

A. We knew when the call was trespassed or perhaps being trespassed by the 800 code being first accessed and being decoded by the D.R. 35. At the same time, before any connection onto the network for a completion of the call, the third number would be given and it became all but one hundred percent that that's— third number fraud was being committed.

We did have the capability that a legitimate call could have been monitored or overheard. But, again, I did not and was not concerned with any calls that woud be dialed direct without the digit one or if the sur-number was or if the number was given to the CAMA operator and if it was not an 800 call.

Q. *You are saying that you can distinguish or could distinguish between what you call trespass calls and what was not?*

A. *Yes, there was that capability."*[3] (emphasis added)

Mr. Beam testified, in effect, that the taping equipment was turned off when legal calls were made, and was not reactivated until another illegal call was made.[4] The quote referred to by the majority: "Q. You had to identify it as a trespass call by listening to the substance of it? A. That's right. And when we were in, I mean, this is what [sic] basically what I would do."[5] was part of the dialogue concerning the use of the tape recorder. I do not view this quote as a final and absolute indicator that all calls, legal and illegal, were monitored to some extent.

Even if we acknowledge that there is inconsistency in the testimony concerning which calls were monitored, I cannot agree with the majority's statements that, ". . . the

---

3. NT 191-192.

4. NT 239-240.

5. NT 241.

only means of identifying the call as illegal was by listening to its substance. . . . [N]o attempt was made to minimize the intrusion." The testimony to the opposite is simply too extensive and detailed to ignore.[6]

The legislature was aware of the overwhelming problems caused the telephone company by the enactment of the statute prohibiting wiretapping. To compensate, the legislature also enacted the exception. Bell Telephone Company was merely exercising its options under the statute, and I am somewhat amazed at the ensuing controversy. The exception does not permit indiscriminate wiretapping by law enforcement officers, nor does it allow the fruits of the tapping to be used for any purpose save that of preventing fraud against the telephone company. The rights extolled by the majority are placed in no danger by these tapping activities.

The majority, in its conclusion, seems to indicate that to disagree with its conclusion is an act bordering on sedition. I do not so view it, for I do not perceive our charge to be to so jealously guard the individual that we do damage to the very free society we are sworn to protect. We must, when diverting the sword of justice, be certain our decisions sharpen the tools of justice and not dull them into meaningless objects. I believe the lower court erred in suppressing the evidence obtained by use of the monitoring, and would, therefore, reverse the suppression order and allow the Commonwealth to use the evidence.

6. NT 191-192, 238-242.