555 A.2d 82

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Steven W. BRACHBILL and Darrell R. Musser, Appellants.**

Supreme Court of Pennsylvania.

Argued May 9, 1988.

Decided March 6, 1989.

Joseph M. Devecka, State College, for appellants.

Ross H. Cooper, Asst. Dist. Atty., Mark S. Smith, First Asst. Dist. Atty., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

NIX, Chief Justice.*

Before us by allowance are the appeals of Steven Brachbill and Darrell Musser, from orders of the Superior Court affirming their convictions for certain criminal offenses. 363 Pa.Super. 615, 527 A.2d 113. We consolidated the appeals for argument and disposition.

Darrell Musser and Steven Brachbill were jointly tried before a jury in the Court of Common Pleas of Centre County. Mr. Musser was convicted of the offenses of Intimidation of Witnesses or Victims, 18 Pa.C.S. § 4952, and Criminal Conspiracy, 18 Pa.C.S. § 903. Mr. Brachbill was convicted of criminal conspiracy.[1]

---

* This case was reassigned to this writer.

1. Both of these appellants were also convicted of the summary offense of harassment, 18 Pa.C.S. § 2709. These summary convictions are not presently before us.

After the denial of post-trial motions, appellants were sentenced to a term of two to twelve months, given credit for one day served and immediately furloughed under certain conditions and restrictions. Appellants appealed these convictions to the Superior Court which affirmed the judgments of sentence. We granted allocatur and, for the reasons that follow, reverse the judgment of sentence and order a new trial.

The criminal charges against Brachbill and Musser arose from acts committed by them during their employment as guards at the Centre County Prison. In August of 1984, the appellants, while employed as guards at the institution, perpetrated several acts of physical abuse against an inmate named Robert Riggleman. Inmate Riggleman was scheduled to be released from the prison on August 14, 1984. During the last three days of Riggleman's incarceration, guards Brachbill and Musser subjected him to a series of abuses which included unlawful shackling and handcuffing, and the forcible administration of an enema, all for their sport and amusement.[2] On the eve of Riggleman's release from the prison, he disclosed to prison officials what Brachbill and Musser had done to him; he also agreed to cooperate with the authorities in their decision to take action against the two guards. Riggleman assisted the state police by providing details of the assaults perpetrated upon him and by revealing the several attempts by the guards to persuade him not to talk to the police.

Riggleman was contacted by the guards shortly after his release from the prison. The guards explained to Riggleman that their conduct during his last few days of incarceration was being scrutinized and they told him not to talk to the police. They asked him to call them every day or so and they offered to pay for the calls. Riggleman encountered guard Musser at a yard sale one day where Musser told Riggleman that the continuing investigation of the incidents

**2.** A more expansive recitation of the indignities suffered by Mr. Riggleman at the hands of appellants and other prison guards is set forth in this Court's opinion in *County of Centre v. Darrell Musser*, et al., 519 Pa. 380, 548 A.2d 1194, 1195–96 (1988).

was a concern to the guards. He once again told Riggleman not to discuss the incidents with the police. At that time, Musser gave Riggleman $7.00, and offered to buy Riggleman some pants and to take Riggleman's family out to dinner. Riggleman informed the state police about this encounter and about other calls he was receiving from the guards.

At one point Riggleman returned a call to Brachbill which Riggleman allowed State Police Corporal Jan Hoffmaster to listen to on an extension phone. During that conversation, Brachbill encouraged Riggleman not to reveal to the police the details of the guards' involvement in the assaults. Brachbill did not consent to, nor was he even aware of, Hoffmaster's monitoring of the conversation.

In this appeal Brachbill and Musser challenge the Superior Court's affirmance of their convictions on two grounds. It is first contended that there was insufficient evidence to sustain the intimidation charge under section 4952 because of the absence of any evidence of intimidation. Secondly, it is argued that the trial court should have granted the motion to suppress the testimony of a state police officer relating to an unlawfully intercepted telephone conversation. Although we are of the view that relief must be given based upon the second allegation, we are nevertheless constrained to discuss the first contention. Since the first argument is in effect a claim that the motion in arrest of judgment made at trial should have been sustained, it would require, if valid, the preclusion of a retrial as to the charge of intimidation. *See, e.g., Commonwealth v. Cardona,* 316 Pa.Super. 381, 463 A.2d 11 (1983); *Commonwealth v. Ruffin,* 317 Pa.Super. 126, 463 A.2d 1117 (1983).

## I.

█ Appellants' assertion that the offense of intimidation as defined in the Code requires proof of threats to support a conviction is meritless. Section 4952, in pertinent part, reads: [3]

**3.** The remaining portion provides:

(a) Offense defined—A person commits an offense if, with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he *intimidates* or attempts to intimidate any witness or victim to:

(1) Refrain from informing or reporting to any law enforcement officer, prosecuting official or judge concerning any information, document or thing relating to the commission of a crime....

(Emphasis added.)

Appellants argue that a conviction for intimidation cannot be sustained because there was no evidence at trial that Riggleman was threatened. They assert that without proof of threats there is insufficient evidence of intimidation to prove a violation. Appellants further contend that the courts below incorrectly held that the term "intimidate,"

(2) Give any false or misleading information or testimony relating to the commission of any crime to any law enforcement officer, prosecuting official or judge.

(3) Withhold any testimony, information, document or thing relating to the commission of a crime from any law enforcement officer, prosecuting official or judge.

(4) Give any false or misleading information or testimony or refrain from giving any testimony, information, document or thing, relating to the commission of a crime, to an attorney representing a criminal defendant.

(5) Elude, evade or ignore any request to appear or legal process summoning him to appear to testify or supply evidence.

(6) Absent himself from any proceeding or investigation to which he has been legally summoned.

(b) Grading.—The offense is a felony of the third degree if:

(1) The actor employs force, violence or deception, or threatens to employ force or violence, upon the witness or victim or, with the requisite intent or knowledge upon any other person.

(2) The actor offers any pecuniary or other benefit to the witness or victim or, with the requisite intent or knowledge, to any other person.

(3) The actor's conduct is in furtherance of a conspiracy to intimidate a witness or victim.

(4) The actor solicits another to or accepts or agrees to accept any pecuniary or other benefit to intimidate a witness or victim.

(5) The actor has suffered any prior conviction for any violation of this title or any predecessor law hereto, or has been convicted, under any Federal statute or statute of any other state, of an act which would be a violation of this title if committed in this State. 18 Pa.C.S. § 4952.

under the Intimidation of Witnesses Act, and the term "induce," under the preceding Tampering with Witnesses Act, 18 Pa.C.S. § 4907 (Repealed), have the same meaning and encompass the same conduct. The pertinent portions of the prior provision provided:

Offense defined—A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted, he attempts to *induce* or otherwise cause a witness or information to:

\* \* \* \* \* \*

withhold any testimony, information, document or thing except on advice of counsel.

\* \* \* \* \* \*

Grading—The offense is a felony of the third degree if the actor employs force, deception, threat or offers of pecuniary benefit. Otherwise, it is a misdemeanor of the second degree.

18 Pa.C.S. § 4907 (repealed) (emphasis added).

Appellants correctly note that a conviction under the former provision did not require proof of a threat. *See, e.g., Commonwealth v. Kwatkoski,* 267 Pa.Super. 401, 406 A.2d 1102 (1979). They contend that, since the prior provision has been replaced by section 4952, which contains different language, the General Assembly could not have intended that the two acts have the same meaning. They argue that the legislature would have used the term "induce" if it intended the new provision to have the same meaning. According to appellant, the Legislature exhibited its intention to limit the application of the present provision to instances where a witness is actually threatened, and that any inducement which did not involve a form of "intimidation" was not intended to fall within the purview of the newer formulation of the offense. Appellants claim that the words "induce" and "intimidate" do not have the same meaning in their common and ordinary usage, and absent a contrary definition in the Act, they must be given their ordinary meaning. They rely upon the well recognized rule of statutory construction that penal statutes must be strict-

ly construed. *Commonwealth v. Hill,* 481 Pa. 37, 391 A.2d 1303 (1978). They therefore would have us conclude that, because the Commonwealth's evidence only established inducements and did not prove any threats or attempts of coersion, we must reach the conclusion that the record fails to support an offense under section 4952.

■ While this argument at first blush may appear to possess some validity, it totally ignores paragraph (b) of section 4952. The offense as defined in paragraph (a) is expressly deemed to be a felony of the third degree under (b) if: "(2) The actor offers any pecuniary or other benefit to the witness or victim...." Thus, although section 4952(a) uses the word "intimidates" and not the former broader term "induce," it is nevertheless clear that the legislature intended to proscribe, under the provisions of this section, any offers of benefit with the intent to "obstruct, impede, impair, prevent or interfere with the administration of criminal justice, ...," and that such conduct would constitute a felony of the third degree. A rule of construction may never be permitted to give a restrictive meaning to a word or term used in a statutory provision where the clear language of the text of that statute indicates otherwise. An acceptance of the appellants argument in this regard would require that we ignore the clear mandate of (b)(2). Such a result would be clearly in violation of the most basic principles of statutory interpretation. 46 P.S. §§ 551 and 552(2). *See also, Cali v. City of Philadelphia,* 406 Pa. 290, 177 A.2d 824 (1962); *Bonasi v. Board of Adjustment of Haverford Township,* 382 Pa. 307, 115 A.2d 225 (1955); *Commonwealth v. Chaitt,* 380 Pa. 532, 112 A.2d 379, *cert. denied,* 350 U.S. 829, 76 S.Ct. 59, 100 L.Ed. 740 (1955). Accordingly, we therefore reject the contention that a violation of the intimidation provision, as provided for under section 4952, has not been established on this record.

## II.

As previously stated, appellants also contend that the trial court erred in admitting into evidence the contents of

the telephone conversation intercepted by Corporal Hoffmaster. Appellants argue that Corporal Hoffmaster failed to comply with section 5704(2)(ii) of the Wiretap and Electronic Surveillance Act (the "Act"), 18 Pa.C.S. § 5704(2)(ii), and violated section 5703 of the same Act, 18 Pa.C.S. § 5703. For the reasons that follow, we agree.

The facts surrounding this issue are that, in late August, 1984, shortly after Riggleman's release from prison, Steven Brachbill called Riggleman's mother's home and left a message for Riggleman to return his call. Riggleman, who had already discussed the prison events of August 10 through 14th with the police, advised the police that he had been contacted by one of the guards. Corporal Hoffmaster asked Riggleman if he could listen in on the conversation when the call was returned. Riggleman consented to having the call monitored by Hoffmaster. They decided to place the return call from the Philipsburg State Police Barracks. Once there, Riggleman called a number left for him by Brachbill, while Hoffmaster listened to the conversation on an extension phone. Corporal Hoffmaster made notes of what he heard.

Later at trial Corporal Hoffmaster was permitted to testify to the substance of the conversation. Essentially he testified that Brachbill explained to Riggleman that both he and Musser were worried that Riggleman was pressing charges against them for their conduct during his last few days in prison, and that they were worried that their jobs were in jeopardy. Hoffmaster also testified that he heard Brachbill attempt several times to get Riggleman to agree to meet with him and that Brachbill also asked Riggleman to keep in constant contact with him and Musser until the controversy over the incidents subsided. According to Hoffmaster, Brachbill asked Riggleman to "go to bat for us" with respect to the investigation. The contents of this intercepted conversation should have been suppressed under section 5721 of the Act.[4]

4. 18 Pa.C.S. § 5721. *See infra* note 9.

Section 5703 [5] prohibits the willful interception of a wire or oral communication and the willful disclosure or use of the contents of an intercepted communication. An interception is defined under section 5702 as an "[a]ural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." 18 Pa.C.S. § 5702.

Appellants argue that Corporal Hoffmaster unlawfully intercepted the telephone conversation by listening to it on an extension phone. The Commonwealth argues that an interception as proscribed by section 5703 cannot be accomplished through the use of an extension phone, but only through the use of an "intercepting device." The Superior Court, controlled by its prior decision in *Commonwealth v. Hammond*, 308 Pa.Super. 139, 454 A.2d 60 (1982), agreed with the Commonwealth that using a telephone extension to overhear a conversation is not an interception. The Commonwealth urges this Court to adopt the reasoning of *Hammond* that an extension telephone is not an interception device and cannot be used to accomplish an interception.

█ The argument of the Commonwealth presupposes that the willful interception prohibited under section 5703(1) must be accomplished by the use of an intercepting device.

---

**5.** § 5703 Interception, disclosure or use of wire or oral *communications*

Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:

(1) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire or oral communication;

(2) willfully discloses or endeavors to disclose to any other person the contents of any wire or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication; or

(3) willfully uses or endeavors to use the contents of any wire or oral communications, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire or oral communication.

18 Pa.C.S. § 5703 (Emphasis added).

The weakness of this position is that the language of the provision itself does not support such a limitation.

The definitional section, 18 Pa.C.S. § 5702, provides in part:

"Intercept." Aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device.

"Intercepting device." Any device or apparatus, including an induction coil, that can be used to intercept a wire or oral communication other than:

(1) any telephone or telegraph instrument, equipment or facility, or any component thereof, furnished to the subscriber or user by a communication common carrier in the ordinary course of its business, or purchased by any person, and being used by the subscriber, user, or person in the ordinary course of its business; or being used by a communication common carrier in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties; or

(2) a hearing aid or similar device being used to correct subnormal hearing to not better than normal.

18 Pa.C.S. § 5702.

Comparing the definition of the term "intercept" as used in the Act and the definition of the term "intercepting device", it is clear that a telephone extension is capable of an "interception", yet it is expressly excluded in the definition of an "intercepting device." However, the Commonwealth's contention fails because section 5703(1) prohibits a willful interception without limiting it to an interception accomplished by an intercepting device. This distinction is further illustrated in the definitional section under section 5702 where it distinguishes between the concept of an "intercept" and the statutory definition of an "intercepting device." The argument presented by the Commonwealth would require us to amend the definition of "intercept" as it appears in section 5702 as follows:

Aural acquisition of the contents of any wire or oral communication through the use of any [electronic, mechanical, or other device] <u>intercepting device.</u>*

> * (Bracketed material in the section as it presently appears—deleted; underlined portions added by the Commonwealth's interpretation.)

It is obvious that if the legislature had intended that an interception, under the provisions of this Act, must necessarily be accomplished with an intercepting device, it would have so stated.

Where the legislature in an enactment specifically defines a term, it is clear that it intends for that meaning to apply in the reading of that statute. *See, e.g., Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *Hughes v. School District of Pittsburgh,* 379 Pa. 145, 108 A.2d 698 (1954). The fact that the legislature expressly indicated that an interception could occur without an intercepting device under the definition of "intercept" in section 5702 makes it clear that, in its use of the term "intercept" in 5703(1), it did not intend to confine the term to interceptions obtained through "intercepting devices." To conclude otherwise requires us to ignore the definition given and to distort an unambiguous direction. Where the provisions of a statute are clear and free from any ambiguity, courts are not free to ignore the letter of the provision under the guise of a search for its intent. 1 Pa.C.S. § 1921(b); *Zimmerman v. O'Bannon,* 497 Pa. 551, 442 A.2d 674 (1982); *In re Estate of Fox,* 494 Pa. 584, 431 A.2d 1008 (1981); *Commonwealth v. Pope,* 455 Pa. 384, 317 A.2d 887 (1974).

Moreover the structure of the Act evidences a clear legislative intention to create such a distinction. Section 5703 was designed to reinforce the protection of the expectation of privacy of parties to such communications against the surreptitious interception by third parties. The means employed to achieve this surreptitious intrusion is not relevant to the interest being protected by section 5703. It is the interception and not the intercepting device that breaches the expectations of privacy that section 5703 is designed to reinforce. Section 5704(2)(ii) merely provides for an

exception to the prohibition under 5703 for law enforcement officers where certain procedures are followed prior to the interception. In both sections the interception is the focal point, and in neither section did the legislature intend to restrict the provision to interceptions accomplished with an "intercepting device."

■ The purpose for defining "intercepting devices" under the definitional section becomes apparent in sections 5705 [6] and 5706.[7] In both of these sections "intercepting

6. § 5705. Possession, sale, distribution, manufacture or advertisement of intercepting devices

Except as otherwise specifically provided in section 5706 (relating to exceptions to prohibitions in possession, sale, distribution, manufacture or advertisement of intercepting devices), a person is guilty of a felony of the third degree if he does any of the following:

(1) Willfully possesses an intercepting device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of a wire or oral communication.

(2) Willfully sells, transfers or distributes an intercepting device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of a wire or oral communication.

(3) Willfully manufactures or assembles an intercepting device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of a wire or oral communication.

(4) Willfully places in any newspaper, magazine, handbill, or other publication any advertisement of any intercepting device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of a wire or oral communication or of any intercepting device where such advertisement promotes the use of such device for the purpose of the surreptitious interception of a wire or oral communication.

7. § 5706. Exceptions to prohibitions in possession, sale, distribution, manufacture or advertisement of intercepting devices

(a) Unlawful activities.—It shall not be unlawful under this chapter for:

(1) a communication common carrier or an officer, agent or employee of, or a person under contract with a communication common carrier, in the usual course of the communication common carrier's business; or

(2) a person under contract with the United States, a state or a political subdivision thereof, or an officer, agent or employee of a state or a political subdivision thereof, to possess, sell, distribute, manufacture, assemble or advertise any intercepting device, while

devices" are expressly addressed. These sections regulate the possession, sale, distribution, manufacture and advertisement of "intercepting devices" to achieve the underlying purpose of the Act in protecting the reasonable expectation of privacy in private conversations. The distinction between devices that are designed solely for purposes of surreptitious interception and extension phones, which provide a convenience for many legitimate purposes, is obvious. Thus the difference in treatment of these devices by the legislature for the purpose of regulating public access to them does not justify a conclusion that surreptitious interceptions by means of extension phones is not proscribed under the Act. By using an extension telephone, which qualifies as an "electronic, mechanical or other device," Corporal Hoffmaster intercepted the communication between Brachbill and Musser. His conduct of willfully intercepting the conversation and disclosing its contents in his testimony violated the mandate of section 5703.

■ Having concluded that the interception by Corporal Hoffmaster did indeed violate section 5703, we must determine whether that evidence should have been suppressed under section 5721(a)(1). The Act does permit law enforcement officials to listen in to the conversations of third parties without their knowledge only when the official complies with the procedures provided for such an interception. The official must have the consent of one of the parties to the call; he or she must have that consent evaluated by the proper authority; and the evaluation must be in writing and must verify that the consent of the individual was voluntary. Here there was no attempt to comply with the directive of section 5704(2)(ii). Section 5704, in pertinent part, provides:

§ 5704 Exceptions to prohibition on interception and disclosure of communications

It shall not be unlawful under this chapter for:

acting in furtherance of the appropriate activities of the United States, a state or a political subdivision thereof or a communication common carrier.

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire or oral communication involving suspected criminal activities where:

(i) such officer or person is a party to the communication; or

(ii) *one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be made, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception;* however such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom.

18 Pa.C.S. § 5704(2) (emphasis added).

Corporal Hoffmaster did not comply with this provision before he listened to the conversation on the extension. He was, according to section 5704(2)(ii), under a duty to have the District Attorney or the Attorney General, or one of their assistant attorneys, review the facts of the case and the voluntariness of Riggleman's consent before intercepting the communication. Once Hoffmaster had acquired the prior written approval of the reviewing authority, he then could have lawfully intercepted and revealed the communication.[8] Instead, Corporal Hoffmaster asked Riggleman if

---

8. The Commonwealth argues that the testimony of Hoffmaster was merely cumulative and therefore any error in admitting it would not warrant a retrial. We find this argument unpersuasive since it is clear for two reasons that the testimony of the police officer was not

he could listen to the conversation, Riggleman agreed and then they made the call from the state police barracks.

Corporal Hoffmaster did not have the voluntariness of Riggleman's consent evaluated by any authority. While we have no reason to doubt that Riggleman consented to the interception, it is nevertheless apparent that the provisions of section 5704 were completely ignored. The legitimate expectation of privacy is one of the most precious rights in a free society. *See, e.g., Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Commonwealth v. Murray,* 423 Pa. 37, 223 A.2d 102 (1966); *Commonwealth v. Helms,* 234 Pa.Super. 537, 343 A.2d 362 (1975). We are fortunate that we are not a part of a totalitarian regime that insists upon ascertaining our innermost thoughts and aspirations. It is that freedom of individual privacy that is the hallmark of the society that we are fortunate to enjoy. While compliance in conduct must necessarily be mandated in an ordered society, the freedom to think is insulated from that regimentation. Thus, any argument premised upon the fact that Riggleman may have confirmed the voluntariness of the interception cannot be permitted to override a clear violation under this provision. Rules designed to protect fundamental rights can never be treated as mere surplusage. Since Hoffmaster did not comply with the procedure prescribed under section 5704(2)(ii), the interception was therefore unlawful and the evidence of the contents of the communication should have been suppressed in accordance with section

merely cumulative. First, Hoffmaster's testimony was offered to bolster Riggleman's credibility. Riggleman, a former prisoner, testified to the illegal conduct of two prison guards who worked at the facility in which he was incarcerated. It is quite reasonable that the jury would not have believed the testimony of Riggleman, a polluted source, without substantiation. Quite possibly, Hoffmaster's testimony was the only evidence of the call that was credited by the jury. Secondly, it is clear from the record that Officer Hoffmaster testified to statements made by Brachbill during the call that were not recounted by Riggleman. (N.T. 3/11/85 pp 6–11)

5721(a)(1).[9]

Accordingly, the judgments of sentence are vacated and a new trial is awarded.[10]

PAPADAKOS, J., concurs in the result.

STOUT, J., files a dissenting opinion in which McDERMOTT, J., joins.

STOUT, Justice, dissenting.

Because I disagree with the majority's treatment of whether an extension telephone is an "intercepting device" under the Wiretapping and Electronic Surveillance Control Act, 18 Pa.Cons.Stat.Ann §§ 5701–5727 (Purdon 1983 & Supp.1988) [hereinafter Wiretap Act], I dissent.

Appellants argue that because Corporal Hoffmaster did not obtain prior review of Riggleman's consent to the eavesdropping as required by section 5704(2)(ii) of the Wiretap Act, Hoffmaster illegally intercepted the call and its contents should have been supressed. Whether Appellants' argument is correct depends upon whether Hoffmaster "intercepted" the conversation when he listened over the extension phone, or, stated in the alternative, whether an extension phone is an intercepting device and therefore an object by which one can intercept a call under section 5703 of the Wiretap Act.

Preliminarily, I note that the Wiretap Act is written in language almost identical to that of the Wire Interception and Interception of Oral Communications Act of 1968, 18

---

**9.** § 5721. Suppression of contents of intercepted communication or derivative evidence

    (a) Motion to suppress.—Any aggrieved person in any trial, hearing, or other adversary proceeding in or before any court or other authority of this Commonwealth may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on any of the following grounds:

    (1) The communication was unlawfully intercepted.

**10.** A new trial is ordered on the conspiracy charges as well, since the conspiracy counts were founded on the appellants' alleged scheme to intimidate Riggleman.

U.S.C. § 2510 *et seq.* [hereinafter Wire Interception Act].[1] One can turn, therefore, to the legislative history of the federal statute to determine the guidance the federal act gives.

The Wire Interception Act derived from Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1970). It is clear from the legislative history of the Wire Interception Act that the problem which Congress sought to correct was not eavesdropping over an extension telephone but *electronic* surveillance, the use of wiretaps and "bugs." *See* S.Rep. No. 1097, 90th Cong.2d Sess., *reprinted in 1968 U.S.Code Congressional and Administrative News*, 2112, 2155–56. The problem is outlined in the legislative history as follows:

> The tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of electronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. Commercial and employer-labor espionage is becoming widespread. It is becoming increasingly difficult to conduct business meetings in private. Trade secrets are betrayed. Labor and management plans are revealed. No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage.

*Id.* at 2154.

Since our Wiretap Act so closely parallels that of the federal government, one may assume it was enacted with the same legislative purpose.

This view is supported also by definitions in the field of electronics.

---

1. The Wire Interception Act was amended in 1986 and is now known as the Wire and Electronic Communications Interception and Interception of Oral Communications Act.

A tap is a connection made to an intermediate point on a coil, resistor or other device. R. Turner & S. Gibilisco, *The Illustrated Dictionary of Electronics* 557 (3d ed. 1985), or a connection made at some point other than the ends of a resistor or coil. J. Markus, *Electronic Dictionary* 711 (4th ed. 1978). Wiretapping, according to Turner and Gibilisco, is "the (usually illicit) act of making direct or indirect connections to a communications line for the purpose of overhearing or recording a conversation." According to Markus, a wiretap is a secretly made and concealed connection to a telephone line, office intercommunication line, or other wiring system, for monitoring conversations and activities in a room from a remote location without knowledge of the participants, legally or illegally. The use of an extension telephone does not fulfill the definitional requirements of wiretapping or electronic surveillance.

In rejecting Appellants' arguments, the Superior Court cited its decision in *Commonwealth v. Hammond*, 308 Pa.Super. 139, 144, 454 A.2d 60, 62 (1982), which, I believe, correctly held that an extension telephone is not an intercepting device and, therefore, one using an extension telephone cannot "intercept." In *Hammond*, the eavesdropper was the victim's sister. Appellants argue that a different result should obtain when the eavesdropper is an officer of the law. Nonetheless, the *Hammond* result has been reached under section 605 of the Federal Communications Act, 47 U.S.C. § 605 (1982),[2] where the eavesdroppers were police officers. *Rathbun v. United States*, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957). *See United States v. Kountis*, 350 F.2d 869 (7th Cir.1965), *cert. denied*, 382 U.S. 980, 86 S.Ct. 554, 15 L.Ed.2d 470 (1966).[3]

Other state courts have held that the use of an extension telephone is not the use of an electronic, mechanical or

**2.** Section 605 provides, in relevant part, that "no person not being authorized by the sender shall intercept any communication."

**3.** *See* Annotation, *What Constitutes an "Interception" of a Telephone or Similar Communication Forbidden by the Federal Communications Act [47 USC sec. 605] or Similar State Statutes,* 9 A.L.R.3d 423, § 3(a) at 426–29, § 5(a) at 434–42 (1966 & Supp.1987).

552

other device so as to constitute an interception. *See Adams v. State,* 43 Md.App. 528, 406 A.2d 637 (1979), *aff'd,* 289 Md. 221, 424 A.2d 344 (1981); *State v. Page,* 386 N.W.2d 330 (Minn.Ct.App.1986); *State v. McDermott,* 167 N.J.Super. 271, 400 A.2d 830 (1979); *State v. Bonilla,* 23 Wash.App. 869, 598 P.2d 783 (1979). Although mindful that these federal and state authorities are not binding on this Court, I believe that they reflect the correct analysis of extension telephones and "intercepting devices." For this reason I dissent from the majority's holding to the contrary.

McDERMOTT, J., joins in this dissenting opinion.