**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Jeffrey S. CRUTTENDEN, Appellee.**

**Commonwealth of Pennsylvania, Appellant**

v.

**Stephen Lanier, Appellee.**

Superior Court of Pennsylvania.

Submitted Oct. 27, 2008.
Filed June 8, 2009.
Reargument Denied Aug. 20, 2009.

---

1. The "RICO" statute is formally known as the Racketeer Influenced and Corrupt Organi-
zations Act, 18 U.S.C. §§ 1961–1968.

James L. McMonagle, Asst. Dist. Atty., for the Com., appellant.

Joseph F. Sklarosky, Forty Fort, for Cruttenden, appellee.

Basil G. Russin, Public Defender, for Lanier, appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS and DONOHUE, JJ.

OPINION BY DONOHUE, J.:

¶ 1 The Commonwealth appeals from the order dated March 17, 2008 granting suppression motions filed by Jeffrey S. Cruttenden ("Cruttenden") and Stephen Lanier ("Lanier").[1] After careful consideration, we affirm.

---

1. The Commonwealth may take an appeal of right from an order that does not end the entire case if the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution. Pa.R.A.P. 311(d); *Commonwealth v. Torres,* 564 Pa. 86, 764 A.2d 532, 536, n. 2 (2001). The Commonwealth has complied in this case.

¶ 2 The facts and procedural history of this case are as follows. On March 27, 2007, an officer of the Pennsylvania State Police stopped a speeding pickup truck with Arizona license plates on I–80 in Clearfield County. Daryl Taylor ("Taylor") was driving the vehicle and was discovered to have a suspended Arizona driver's license. Police identified Michael Amodeo ("Amodeo") as his passenger. After issuing Taylor a citation for driving with a suspended license and warning him of his excessive speed, the officer asked Taylor and Amodeo what their travel plans were. When the two men gave conflicting stories, the officer asked whether they were transporting firearms or narcotics. Taylor became nervous and stated that he had a weapon. The officer obtained Taylor's consent to search the vehicle. Using a canine unit, police uncovered approximately 35 pounds of marijuana, methamphetamines, drug paraphernalia, a .45 caliber handgun and a cellular "Tracfone." Taylor and Amodeo were arrested.

¶ 3 Taylor and Amodeo were transported to the Clearfield County police station for questioning. Officer Richard Houk ("Officer Houk") interviewed Amodeo. Amodeo told Officer Houk that he was approached by a man named "Steve" in Arizona who wanted to supply a friend in the Pennsylvania/New York area with marijuana. Although Amodeo did not know Steve's last name, he described him to police as a short, white male with blonde hair, a mustache and possible tattoos on his arms. Amodeo stated that Steve had agreed to buy 35 pounds of marijuana for $19,000. According to Amodeo, the plan entailed Steve flying cross-county to meet the friend/buyer while Amodeo drove the narcotics intending to meet him at an undisclosed location in Pennsylvania. Taylor accompanied Amodeo in exchange for $2,500. Amodeo told Officer Houk that Steve gave him the Tracfone to keep in contact with him and to arrange the final meeting place via text messages. Officer Houk obtained Amodeo's consent to use the Tracfone.

¶ 4 Subsequently, and without first obtaining an order of court, Officer Houk, posing as Amodeo, began text-messaging Steve. Because there was a lull in communication due to the arrest of Taylor and Amodeo, Steve was initially suspicious and asked a series of questions to which only Amodeo would know the answers. Officer Houk obtained those answers from Amodeo and relayed them via text-message to Steve. Apparently satisfied that he was still in contact with Amodeo, Steve gave directions to a Holiday Inn off of Interstate 80 where he wanted to meet to complete the transaction.

¶ 5 Police initiated a surveillance team to investigate the hotel parking lot. There they found Cruttenden sitting in a parked car with New York license plates. Police also observed Lanier enter the car, exit the car, and then walk around to the other side to talk to Cruttenden through the driver's side window. A uniformed police officer pulled a marked police car into the lot behind the suspect vehicle. The officer exited the car and asked if Lanier was named "Steve." Lanier responded affirmatively and the police officer commanded him to take his hands out of his pockets. When Lanier did not comply, the officer wrestled him to the ground and handcuffed him. A search of Lanier uncovered $20,000 in cash. Lanier and Cruttenden were both arrested.

¶ 6 Police subsequently obtained a search warrant for the vehicle in which Lanier and Cruttenden were found. Inside, police discovered two cellular phones, a cellular Tracfone (bearing the telephone number used by Steve to text-message

Amodeo), a road map, internet driving directions, and a motel receipt.[2]

¶ 7 Lanier and Cruttenden were both charged with criminal attempt, criminal conspiracy, and dealing in proceeds of unlawful activities.[3] Their cases were consolidated for trial. Lanier and Cruttenden filed pre-trial motions to suppress the evidence obtained, alleging that the warrantless interception of the text messages was illegal and not subject to an exception under the Pennsylvania Wiretapping and Electronic Surveillance Act, ("Wiretap Act"), 18 Pa.C.S.A. § 5701, *et seq.* Following an evidentiary hearing, the trial court agreed and granted the motions.

¶ 8 The Commonwealth appealed and presents the following issue for our review:

Did the lower court err in finding that the intercepted text messages were illegally obtained, thus suppressing all of the evidence that was obtained as a result of the illegal interception?

Appellant's Brief at 4.

■ ¶ 9 In reviewing the grant of a motion to suppress, we are guided by the following standard of review:

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of facts bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Deck,* 954 A.2d 603, 606 (Pa.Super.2008) (citations omitted). Because the Commonwealth challenges the trial court's interpretation of the Wiretap Act, it is a case of statutory construction and, thus, a question of law. *Id.* On questions of law, our standard of review is *de novo,* and our scope of review is plenary. *Id.*

■ ¶ 10 An examination of the Wiretap Act is warranted. As our Supreme Court has stated:

Pennsylvania's Wiretapping and Surveillance Control Act, is a pervasive scheme of legislation which suspends an individual's constitutional rights to privacy only for the limited purpose of permitting law enforcement officials, upon a showing of probable cause, to gather evidence necessary to bring about a criminal prosecution and conviction. The statute sets forth clearly and unambiguously by whom and under what circumstances these *otherwise illegal practices* and their derivative fruits may be used.

*Boettger v. Loverro,* 521 Pa. 366, 370–71, 555 A.2d 1234, 1236–37 (1989) (emphasis in original), *vacated and remanded on other grounds, Easton Publishing Co. v. Boettger,* 493 U.S. 885, 110 S.Ct. 225, 107 L.Ed.2d 178 (1989). Because the Wiretap Act emphasizes the constitutional protection of privacy, its provisions are strictly construed. *Commonwealth v. Spangler,* 570 Pa. 226, 232, 809 A.2d 234, 237 (2002).

¶ 11 Because we are asked to review the trial court's analysis of the Wiretap Act we are mindful that "[t]he purpose of the interpretation and construction of statutes is to ascertain and effectuate the legislature's intent." *Chanceford Aviation Properties, LLP v. Chanceford Twp. Bd. of Supervisors,* 592 Pa. 100, 107, 923 A.2d 1099, 1104

---

**2.** Police later obtained a court order to seize the Tracfone telephone records. These records confirmed that the Tracfone was used to communicate with Amodeo.

**3.** 18 Pa.C.S. §§ 901, 903, and 5111, respectively. Following a preliminary hearing, the dealing in proceeds of unlawful activities charges against both men were dismissed.

(2007) (citing 1 Pa.C.S. § 1921(a)). In construing statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage...." 1 Pa. C.S. § 1903(a). "When the words of a statute are clear and free from all ambiguity, they are presumed to be the best indication of legislative intent." *Hannaberry HVAC v. WCAB (Snyder, Jr.)*, 575 Pa. 66, 77, 834 A.2d 524, 531 (2003). "It is only when the statute's words are not explicit that the legislature's intent may be ascertained by considering the factors provided in 1 Pa.C.S. § 1921(c)." *Chanceford*, 923 A.2d at 1104.

¶ 12 The Wiretap Act criminalizes the intentional interception of wire, electronic, and oral communications and prohibits the use of the contents of any communication derived from such an interception. 18 Pa. C.S.A. § 5703.

¶ 13 The Wiretap Act defines "electronic communication" as:

'Electronic communication.' Any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system, except:

(1) Deleted.

(2) Any wire or oral communication.

(3) Any communication made through a tone-only paging device.

(4) Any communication from a tracking device (as defined in this section).

18 Pa.C.S.A. § 5702 (boldface omitted).

¶ 14 "Intercept" is defined by the Wiretap Act as:

'Intercept.' Aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device. The term shall include the point at which the contents of the communication are monitored by investigative or law enforcement officers.

18 Pa.C.S.A. § 5702 (boldface omitted).

██ ¶ 15 In this case, the trial court granted Cruttenden's and Lanier's motions to suppress, finding: (1) the text-messages sent by Lanier to Amodeo constituted an electronic communication within the meaning of the Wiretap Act; (2) Trooper Houk's acquisition of the text messages sent by Lanier constituted an interception of that electronic communication; (3) the Commonwealth failed to cite authority which allowed the police to intercept the text messages without a warrant; and (4) Trooper Houk's interception of the text messages sent by Lanier violated the Wiretap Act. Trial Court Opinion, 3/17/2008, at 8.[4]

¶ 16 The Commonwealth argues that the trial court erred in interpreting and applying the Wiretap Act for several reasons.[5] First, it claims that the Wiretap Act does not apply to this case, because the text messages were not "intercepted" pursuant to the statutory definition. The Commonwealth posits that the Wiretap Act "was not intended to prevent someone from misrepresenting his or her identity." Appellant's Brief at 7. Moreover, the Commonwealth contends that "once Trooper Houk began to respond to the Text messages posing as [Amodeo], he was the intended recipient of the communications, thus the

---

4. The trial court failed to cite any legal authority in its opinion in support of the order granting suppression.

5. The Commonwealth does not challenge the trial court's determination that text messages

are electronic communications. However, upon review, we find that text messages do constitute electronic communications as statutorily defined. Here, the text messages were writings or other data transmitted electronically by cellular telephones.

Wiretap Act does not apply." *Id.* For these propositions, the Commonwealth relies upon *Commonwealth v. Proetto,* 771 A.2d 823 (Pa.Super.2001). In addition, the Commonwealth suggests that an interception requires the use of a separate device by police. Appellant's Brief at 10. Finally, the Commonwealth posits that Lanier had no expectation of privacy in the text messages, that anyone could have been "looking over the recipient's shoulder reading along" or shared "the text message once it was received." *Id.* at 10–11. For this final argument, the Commonwealth relies upon our Supreme Court's decision in *Commonwealth v. Rekasie,* 566 Pa. 85, 778 A.2d 624 (2001). For the reasons that follow, we disagree.

■■ ¶ 17 Based on the clear language of the statute and our standard of review, we find that the trial court did not err in finding the action taken by police in this case was an illegal interception pursuant to the Wiretap Act. As previously stated, text messages constitute electronic communications as statutorily defined. Officer Houk intercepted those electronic communications using an electronic device, the Tracfone. The plain language of the statute does not require a separate device to be used by police to constitute a violation of the Wiretap Act. In fact, the statute defines interception as the acquisition of an electronic communication through **any** electronic device. *See* 18 Pa.C.S.A. § 5702 (emphasis added). Moreover, our Supreme Court has previously held as such in a similar context, when police intercepted communications by listening to a conversation on an extension telephone line. *See Commonwealth v. Brachbill,* 520 Pa. 533, 555 A.2d 82 (1989) (holding that willful interception of wire or oral communication, proscribed by statute, may not be accomplished through the use of an extension phone and is not limited to the use of an intercepting device).

¶ 18 Further, the Commonwealth's reliance on *Proetto* is misplaced because that case is distinguishable from the facts at hand. In *Proetto,* an underage female reported to police that the defendant was engaging in sexual innuendo with her and requesting naked photographs of her in an internet chat room, despite knowing that she was a minor. The juvenile forwarded her e-mail communications with the defendant to the police. Our Court found that there was no interception because "[t]he acquisition of the communications was not contemporaneous with their transmission." *Proetto,* 771 A.2d at 829. The same cannot be said in the instant matter. Amodeo did not forward the text messages to police. Officer Houk received the communications as they were transmitted.

¶ 19 The defendant in *Proetto* also challenged the subsequent conduct of police. In that case, armed with the aforementioned information obtained from the minor, a detective posing as a 15–year old girl entered the chat room to make contact with the defendant. However, the detective did not use the same contact information as the minor complainant. The detective created a wholly separate computer profile and initiated contact with the defendant. Our Court found that the detective was a direct party to the communication with the defendant, there was no eavesdropping or wiretapping, and the Wiretap Act was not intended to prevent misrepresentation of identity. *Id.* at 832. As such, our Court found that these communications were not intercepted under the Wiretap Act. Such was not the case in this matter. Here, Officer Houk posed as Amodeo. Therefore, Amodeo was the intended recipient of the communications, not Officer Houk. As such, *Proetto* is inapplicable.

¶ 20 The Commonwealth argues, in the alternative, that Lanier and Cruttenden

were protected from interception only if they possessed an expectation of privacy in the text messages. We reject this assertion based upon our decision in *Deck*.

■ ¶ 21 As noted, Section 5703 prohibits the interception of any "wire, electronic, or oral communication." 18 Pa.C.S.A. § 5703. Section 5702 clearly and explicitly differentiates between "electronic communication" and "oral communication." As stated previously, "electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photomagnetic or photo-optical system[ ...]." 18 Pa.C.S.A. § 5702. Whereas, the term "oral communication" is defined as:

> Any oral communication uttered by a person *possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation. The term does not include any electronic communication.*

42 Pa.C.S.A. § 5702 (emphasis added). Thus, Section 5702's definition of electronic communication does not include an expectation of privacy on the part of the speaker, whereas the term "oral communication" as defined by the same statute, specifically sets forth such an expectation. This Court has previously conducted a similar analysis when comparing the definitions of "oral communication" and "wire communications." *See Deck*, 954 A.2d at 609 (holding that an expectation of privacy is irrelevant to the prohibition under section 5703 of interception, disclosure, or use of a wire communication). Accordingly, Lanier's expectation of privacy is irrelevant.

¶ 22 Further, the Commonwealth's reliance on *Rekasie* on this issue is misplaced. *Rekasie* dealt with a confidential informant who consented to have his telephone conversations taped with the defendant. In *Rekasie*, police, in accordance with Section 5704(2)(ii) of the Wiretap Act,[6] contacted "the Deputy Attorney General who had been designated to review the requests for voluntary intercepts [and she] approved the request for interception after she concluded that [the informant] voluntarily consented to the recording of his conversation." *Rekasie*, 566 Pa. at 88, 778 A.2d at 626. In this case, no such action was

---

6. Section 5704 of the Wiretap Act lists 16 exceptions to the general prohibition of intercepting communications. Section 5704(2)(ii) of the Wiretap Act, specifically provides:

> It shall not be unlawful and no prior court approval shall be required under this chapter for:
>
> * * *
>
> (2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:
>
> * * *
>
> (ii) one of the parties to the communication has given prior consent to such interception. However, *no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be made, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception;* however such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom[.]
>
> 18 Pa.C.S.A. § 5704(2)(ii) (emphasis added).

taken before police intercepted the communications.

¶ 23 Based on the foregoing, we are constrained to conclude that the trial court's decision to grant Lanier's and Cruttenden's motions to suppress was proper. Accordingly, we affirm.

¶ 24 Order affirmed.

¶ 25 STEVENS, J. files a Concurring Opinion.

## CONCURRING OPINION BY STEVENS, J.:

¶ 1 Interpretation of the Wiretap Act, under the facts in the instant case, ignores the realities of technology and gives those who would deal drugs and engage in other nefarious acts a tremendous advantage over law enforcement.

¶ 2 Appellant Lanier was in the process of flying cross country to purchase 35 pounds of marijuana, and Michael Amodeo was in the process of driving to meet Lanier when he came into contact with Officer Richard Houck.

¶ 3 Officer Houck posed as Amodeo, using Amodeo's cell phone, *with the consent of Amodeo* and through a series of text messages learned Lanier's meeting point with Amodeo. After determining Lanier's identity, the police officer arrested Lanier, *and the police subsequently obtained a search warrant for the vehicle in which Lanier and the other appellant were found.*

¶ 4 Clearly, the police were professional in the manner in which this case was investigated and arrests made. The police were not attempting to violate the rights of the suspected drug dealers but, rather, were carrying out their sworn duties to protect law-abiding citizens in a manner consistent with protecting and upholding rights.

¶ 5 Under the current law as to the Wiretap Act, an unrealistic burden is placed on law enforcement where the facts, as here, make it virtually impossible to comply with judicial interpretation of the Act. For example, drug dealers are in transit to complete their illegal transaction while instant text messages are going back and forth between the drug dealers. By the time the police go through the steps required under the Act to *read an instant text message,* with one of the perpetrator's consent, the drug dealers go on their way, free and clear of any consequences to their criminal activity.

¶ 6 In posing as Amodeo with Amodeo's consent, Officer Houck used proper police investigatory tactics to have Appellant Lanier disclose his meeting place. Requiring the police officer to somehow get hold of a prosecutor or find a judge to issue a warrant validating the consent before the officer may act on it is absurd under the circumstances. Time was of the essence here with drug dealers mobile and using text messages to quickly arrange a meeting place, make their illegal exchange and move on. Lanier was suspicious and ready to abort his criminal plan in an instant if need be to avoid arrest.

¶ 7 While one could argue that there was no "interception" or that there was no reasonable expectation of privacy on the part of Lanier in sending the message, the Majority reasoning is sound as to the current state of case law.

¶ 8 To protect law-abiding citizens and to give police officers some leeway in cases where the criminal element is using technology to carry out their crimes, the Legislature should re-examine the goals of the Wiretap Act and amend it accordingly. In a case such as here, where there is third party consent to read an incoming text message, a motion to suppress would be a procedural safeguard which balances the legitimate actions of law enforcement to

protect society with the privacy rights of the individual.[1]

¶ 9 Thus, I concur in the result but do not agree with the current state of the law as applied to cases such as this one.

---

1. Indeed, there are cases where third party consent is given to law enforcement without any requirement of prior approval by a prosecutor or judge. For example, consent by a third party with apparent authority can justify a warrantless search of a person's home without such prior approval. Clearly, there is a constitutionally-recognized right of privacy in a person's home, and this right may be vindicated through a pretrial motion to suppress asking the court to review whether consent was voluntarily given. Yet, the Wiretap Act's additional requirement of prior approval restricts an officer's ability to act on consent to such a degree as to represent a major impediment to legitimate, effective law enforcement. The Legislature did not envision such a result.